UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SEAN WELLONS, et al.,

Plaintiff,

v.

PNS STORES, INC., et al.,

Defendants.

Case No.:  18-CV-02913-RSH-DEB

**ORDER (1) GRANTING DEFENDANTS' MOTION FOR LEAVE TO AMEND; (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; (3) DENYING PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE; AND (4) DENYING PLAINTIFFS' MOTION FOR STATUS CONFERENCE**

**[ECF Nos. 118, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 206, 273, 290]**

In this wage and hour case, Plaintiffs allege that Defendants PNS Stores, Inc. ("PNS") and Big Lots Stores, Inc. ("BLSI") misclassified them as exempt employees and thus owe overtime compensation, accurate itemized wage statements, waiting time penalties, and restitution under California law. ECF No. 1-5 (Third Amended Complaint).

Defendants have filed 19 motions for summary judgment, one as to each of the 19 Plaintiffs (collectively, the "Summary Judgment Motions"). ECF Nos. 118, 121–38. Defendants argue that Plaintiffs' wage and hour claims fail because Plaintiffs fell within the "executive exemption" under California law. Defendants have also moved for leave to

1

amend their Answers to include the executive exemption as an affirmative defense. ECF No. 273.

For the reasons discussed below, the Court (1) grants Defendants leave to amend their Answers; (2) denies summary judgment to Defendants on Plaintiffs' Claims One, Two, and Three; (3) grants summary judgment to Defendants on Claims Four and Five; and (4) grants in part and denies in part summary judgment on Claim Six, brought only by Plaintiff Wellons. The Court also denies Plaintiffs' request for judicial notice and motion for a status conference.

## I.      Background

### A.      Procedural History

Given that the instant matter has been pending for over four and a half years, the procedural history is unsurprisingly both lengthy and complex. The relevant background for the purposes of the pending motions is discussed below.

Plaintiff David Wellons commenced this action in the Superior Court of California for the County of San Diego on January 19, 2018. ECF No. 1-2 (Original Complaint). The original Complaint named BLSI as the sole defendant based on the erroneous assumption that Wellons worked for BLSI. *See id.*; ECF No. 12-3 at 30 (Declaration of David Gallo dated May 25, 2018). After realizing that Wellons was, in fact, employed by PNS, Wellons amended his Complaint on January 23, 2018 to substitute PNS in BLSI's place. ECF No. 12-3 at 30; ECF No. 1-19 at 26 (First Amended Complaint). Wellons never served the original Complaint on BLSI, but he served the First Amended Complaint on PNS on January 30, 2018. *See* ECF No. 12-3 at 30; ECF No. 280 at 8–9. PNS answered the First Amended Complaint on February 26, 2018. ECF No. 1-19 at 40.

On February 28, 2018, BLSI moved for leave to file a "complaint in intervention," seeking to join the action "as a defendant." ECF No. 1-13 (Notice of Motion to Intervene); ECF No. 1-19 at 54 (memorandum in support of motion to intervene). The Superior Court denied that motion because BLSI failed to show "(1) it ha[d] a direct and immediate interest in the action; (2) the intervention [would] not change the issues in the litigation; and (3)

the reasons for the intervention outweigh[ed] any opposition by parties presently in the action." ECF No. 12-3 at 67.

On March 28, 2018, Wellons filed a separate complaint in Superior Court against PNS, bringing claims under California's Private Attorney General Act ("PAGA"). ECF No. 1-6. That matter was later consolidated with the instant case on June 28, 2018. ECF No. 1-12.

On April 10, 2018, Wellons amended his Complaint in the first Superior Court case for the second time (ECF No. 14-3), and PNS answered on May 10, 2018. ECF No. 14-7. BLSI was not named as a defendant in Wellons's Second Amended Complaint.

BLSI renewed its motion to intervene on November 2, 2018. ECF No. 1-15. At this time, Wellons had moved for leave to file a Third Amended Complaint, which added 19 named plaintiffs—including two former BLSI employees.[1] ECF No. 1-5; *see* ECF No. 1-17 ¶ 23. Wellons also sought discovery from BLSI in the form of deposition and document requests. *See* ECF No. 14-22 at pp. 1–58. Given these circumstances, BLSI argued that it was intertwined with PNS and thus qualified as an indispensable, or at least necessary, party under California Code of Civil Procedure section 389. ECF No. 1-17 ¶¶ 4, 18. The Superior Court granted BLSI's intervention on November 30, 2018, finding that "[n]ew facts . . . show[ed] the extent of the interrelationship between [PNS and BLSI]."[2] ECF No. 1-16.

The Superior Court also granted Plaintiffs leave to amend (ECF No. 12-3 at 115), and Plaintiffs filed their Third Amended Complaint ("TAC") on November 16, 2018. ECF No. 1-5. The TAC, which is the operative pleading, asserts six Claims: (1) recovery of statutory overtime compensation under California Labor Code sections 510(a) and 1194;

---

[1] Plaintiff Michael Sims settled his claims against Defendants in 2019 and has since been dismissed from the case. ECF No. 47.

[2] The Superior Court's tentative order (ECF No. 1-16) granting this renewed motion became final on November 30, 2018. ECF No. 1 at 4. Plaintiffs appealed the ruling on December 14, 2018. ECF No. 1-18.

(2) recovery of regulatory overtime compensation under Title 8, section 11070(4) of the California Code of Regulations; (3) unfair competition in violation of California Business and Professions Code section 17200; (4) recovery of statutory penalties for inaccurate itemized wage statements under California Labor Code section 226(e); (5) recovery of penalty wages under California Labor Code sections 201 through 203; and (6) recovery of civil penalties under PAGA. *Id.* Plaintiffs categorized themselves into three groups based on when their employment concluded and which claims they assert:

| Group No. | When Employment Concluded | Plaintiff(s) | Claims |
|---|---|---|---|
| 1 | January 23, 2014 to January 23, 2015 | DeForest | 3 |
| 2 | January 23, 2015 to January 23, 2017 | Arredondo, Hall, Lopez, Toft, Tolliver, Viramontes, and Warner | 1, 2, 3, 5 |
| 3 | After January 23, 2017 | Davis, Duba, Kilgore, Mejia, Seltzer, Sharma, Smith, Walters, Williams, Wellons, Wright | 1, 2, 3, 4, 5 |

*Id.* ¶ 3. Only Wellons asserts Claim Six, the PAGA claim. *Id.* ¶ 44.

PNS filed an Answer to the TAC and Wellons's PAGA Complaint on December 31, 2018. ECF Nos. 2–3. BLSI is not included on either of these Answers, and none of PNS's Answers included an executive exemption defense.

On December 13, 2018, Defendants removed the case to federal court based on the Class Action Fairness Act ("CAFA"). ECF No. 1.[3] After an unsuccessful attempt to remand the case (*see* ECF No. 23), Plaintiffs moved to dismiss their class allegations on May 15, 2019. ECF No. 24. The Court granted the motion, which was unopposed, leaving behind Plaintiffs' individual claims. ECF No. 28. Defendants subsequently filed a motion to sever

---

[3] The Court denied Plaintiffs' motion to remand (ECF No. 12), holding that the Court had original jurisdiction over Plaintiffs' class action claims under CAFA and supplemental jurisdiction over the state law PAGA claims. ECF No. 23.

the claims of each individual Plaintiff (ECF No. 117), the pending Summary Judgment Motions (ECF Nos. 118, 121–38), and a motion for attorneys' fees (ECF No. 139).

On October 22, 2020, the Court *sua sponte* remanded the instant case for lack of subject matter jurisdiction. ECF No. 146. The Court declined to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. *Id.* at 5. All pending motions were dismissed without prejudice, including Defendants' Summary Judgment Motions. *Id.*

Upon Defendants' motion for reconsideration (ECF No. 147), however, the Court reversed. ECF No. 152. The Court concluded that the prior order to remand was erroneously entered: "Once CAFA jurisdiction is properly invoked at the time of removal, post-filing developments do not defeat the federal court's jurisdiction." *Id.* at 2. On September 29, 2021, the Court heard oral argument on the Summary Judgment Motions. ECF No. 255.

On October 22, 2021, Defendants sought leave to amend their Answers to add, for the first time, an affirmative defense that Plaintiffs were exempt employees. ECF No. 264.[4]

---

[4]    On May 14, 2019, another suit involving the same Defendants and counsel commenced in San Diego Superior Court. *See Menlo v. Big Lots Stores, Inc.*, No. 37-2019-00024738 (hereinafter, the "Menlo Action"). Defendants explained that at closing argument of the trial in the Menlo Action, Plaintiffs' counsel raised, "for the first time," that Defendants had not properly pleaded the affirmative defense of exemption. ECF No. 264 at 3. After the evidentiary portion of the trial was complete, the Court granted Defendants' oral motion to amend its answer to allege the exemption defense. ECF No. 275-1 at 2. Defendants maintain they had properly pleaded the defense in both the Menlo Action and the instant case but moved to amend "out of an abundance of caution" to "eliminate any doubt regarding this issue" and "avoid any unnecessary future litigation of this issue." ECF No. 264 at 3–4.

On January 27, 2022, the Superior Court presiding in the Menlo Action issued a tentative decision, finding that Defendants proved its affirmative defense only as to one plaintiff. ECF No. 275-1. The Superior Court concluded that it could not infer exemption applied for all workweeks because the evidence "made clear that different things happened on different weeks." *Id.* at 2. Further, the court held that Defendants "did not communicate *realistic* expectations that the plaintiffs spend the majority of their time on exempt tasks, nor was there any concrete expression of displeasure over the plaintiffs' performance." *Id.*

The Court denied Defendants' motion without prejudice, finding no good cause for an amendment at "this late stage in the litigation." ECF No. 272 at 3 (Order dated March 29, 2022). In that order, the Court also emphasized that Defendants had never pleaded exemption as an affirmative defense. *Id.* The Court ordered Defendants to submit supplemental briefing "as to the current state of the Summary Judgment Motions," noting that "the parties submitted extensive briefing premised upon the assumption that Defendants had properly pled the Exemption Affirmative Defense." *Id.* Defendants filed supplemental briefing on this issue, and Plaintiffs have filed a response. ECF Nos. 274–75. The Parties agreed that the Court should "adjudicate the merits of the pending motions for summary judgment, including the unpleaded affirmative defense that both sides have fully briefed." ECF No. 275 at 6.

On April 19, 2022, Defendants filed the pending motion styled as a "Motion to Modify Scheduling Order," again seeking to amend their Answer to explicitly include an exemption defense. ECF No. 273.

On June 24, 2022, this case was transferred to the undersigned. ECF No. 286.[5] On September 22, 2022, Plaintiffs filed a motion for a status conference, effectively requesting the Court to expedite ruling on the pending motions. ECF No. 290.

### B.     Facts

Defendants operate stores called Big Lots! (hereinafter, "Big Lots") in California that sell home goods and related products.[6] ECF No. 119 ¶ 1 (Defendants' Separate Statement of Undisputed Facts). Each Big Lots store is managed by one Store Team Leader

---

[5]     The Court has reviewed the transcript of the September 29, 2021 hearing on the Summary Judgment Motions. *See* ECF No. 258. No further oral argument is required.

[6]     PNS and BLSI are corporate affiliates with the same parent company, Big Lots, Inc., an Ohio company. ECF No. 1-17 ¶ 3 (Defendants' Complaint in Intervention); ECF No. 4 at 2. PNS is a California company that operates approximately 134 Big Lots stores in California. ECF No. 1-17 ¶ 3. BLSI is an Ohio company that operates 17 Big Lots stores in California. *Id.* ¶ 2.

("STL"),[7] who is the highest-level employee in each store. *Id.* ¶¶ 4, 6. The STL reports to the District Team Leader ("DTL"), who manages a group of Big Lots stores within a district; the DTLs are employees of BLSI.[8] *Id.* ¶ 2; ECF No. 1-17 ¶ 9. Each store also has other employees who work under the STL, like Assistant Team Leaders, department leads, and store associates. ECF No. 119 ¶ 7. All employees in the store report to the STL. *Id.* ¶ 14.

The 19 individual Plaintiffs worked as STLs at Big Lots and were paid as exempt employees. *See id.* ¶¶ 20–22; ECF No. 224 at ¶ 16. Plaintiffs admit that the monthly salaries during their tenures as STLs were equal to or more than twice the California minimum wage for full-time employment. ECF No. 224 ¶ 18. STLs are also eligible to earn a bonus based on store performance. *Id.* ¶ 19. Plaintiffs usually directed the work of two or more employees and had authority to hire and fire employees at their stores. *Id.* at ¶¶ 21–22. All other employees in the stores are nonexempt. *Id.* ¶ 17.

As STLs, Plaintiffs had duties and responsibilities involving the management of stores. The job description for STL states, among other things, that the position is responsible for "leading, planning, and directing the entire Store Team" and will be "[o]ccasionally required to prepare for freight processing, stock shelves, or participate in other aspects of the freight flow process." ECF No. 120-1.

Defendants also maintained materials and provided training for STLs related to their roles, though some Plaintiffs dispute they received certain training. *See* ECF No. 119 ¶¶ 28–32, 35. In particular, Defendants presented STLs a document titled "Week in the Life of the Store Team" (hereinafter, "Week in the Life") that stated the primary responsibility of STLs as "Lead Store Operations." ECF No. 120-12. The document also lists eight "focus areas" for STLs:

---

[7]     In 2015, Defendants changed the "Store Manager" title to STL. ECF No. 119 ¶ 15.
[8]     BLSI manages the recruiting of all STLs and is responsible for the employment and wage-and-hour policies that apply to them. ECF No. 1-17 ¶¶ 11, 17.

(1) Manager on Duty ("MOD")[9]
(2) Full "J-Walks,"[10] and Corrections
(3) Schedule
(4) Merchandising Prep
(5) "Never Outs" (also referred to as "neverouts" or "NVO")[11] Management
(6) Staffing and HR Function
(7) Business Acumen
(8) Regional Team Leader/District Team Leader Communication

*Id.* The duties of the MOD were introduced as part of the "MOD program," which Defendants implemented in or around 2016. ECF No. 224 ¶ 460. Defendants trained the MOD to constantly move through the store in a "figure 8" to observe what is going on in the store; direct action to impact the customers' experience and drive sales; and deliver informal coaching to associates. *Id.* ¶¶ 37–40. Defendants offered training on the MOD Program, as set forth in materials such as the "The MOD Program" document and PowerPoint presentation. *See* ECF No. 120 ¶ 21; ECF No.120-6; ECF No. 120-7.

Typically, Defendants evaluated STLs on an annual basis, using a performance evaluation form. ECF No. 119 ¶ 23. This form included several categories for evaluating STLs, such as

(1) managing, coaching, training, and developing employees;
(2) delegation, time management, leadership, and decision making; and
(3) analyzing trends at their store and identifying opportunities.

*Id.* at ¶¶ 24–27. The form did not have a category for nonexempt tasks. *Id.* ¶ 27.

For the various tasks throughout the store, STLs were required to work within a "labor budget," which was the number of labor hours Defendants allotted for each store

---

[9]    The "MOD" is the person who answers questions on the sales floor from all other associates. *See* ECF No. 224 ¶ 249. Any time a store is open, someone must be serving as the MOD. *Id.*

[10]    "J-Walks" consist of moving through the store and assessing it to see if it is meeting company standards. ECF No. 136-1 ¶ 37.

[11]    "Never Outs" are stock items for sale that are designated as essential in that they are required to always be in stock. ECF No. 224 ¶ 251.1; ECF No. 136-1 ¶ 46.

based on a mathematical formula. ECF No. 224 ¶ 478. The labor budgets took into account the need for cashiers, associates to perform recovery, the hourly management team, and labor needed for the "Dock to Stock" process (i.e., the process of unloading merchandise trucks, sorting the merchandise, and stocking the merchandise on the sales floor). ECF No.136-1 ¶ 84. Although the budgets were calculated annually, Defendants provided the allotment of labor hours to STLs on a weekly basis. *See* ECF No. 224 ¶¶ 484, 489; *see also* ECF No. 191 at 74:4–10. In addition to the labor budget, there are hours called "kitty hours" that are allocated to a store for a specific project or need. ECF No. 224 ¶ 247. Kitty hours were under the control of regional leadership. *Id.*

In 2015, Defendants adopted a program called the "Store Revolution," which aimed to improve the customer shopping experience. *See id.* ¶¶ 68–89. Around the same time, Defendants instituted a labor scheduling program called Empower, which "was intended to ensure the hours were used to the appropriate jobs correctly." ECF No. 119-7 at 14:1–11. Empower automatically populated the schedule assignments for each store. *See* ECF No. 207-1 ¶ 114; ECF No. 210-1 ¶ 36. STLs could revise the assignments generated by Empower but "were not allowed to make too many edits." ECF No. 210-1 ¶ 36.

## II.    Motion for Leave to Amend

In a previous order, the Court stated that given the existence of a scheduling order, any amendment to the pleadings at this stage would be reviewed under the standard set forth in Federal Rule of Civil Procedure 16, rather than the more liberal procedures afforded by Rule 15. *See* ECF No. 272 at 2. Rule 16 provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Good cause" focuses on the diligence of the party seeking an amendment. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). In evaluating timeliness, courts must inquire "whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (quoting *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990)). District courts have also found good cause "where the non-moving

party is already on notice of the moving party's reasons for modifying the scheduling order." *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, No. 18CV967-GPC(MSB), 2020 WL 1864781, at *6 (S.D. Cal. Apr. 14, 2020) (collecting cases); *see Sousa ex rel. Will of Sousa v. Unilab Corp. Class II (Non–exempt) Members Grp. Benefit Plan*, 252 F. Supp. 2d 1046, 1059 (E.D. Cal. 2002) (finding good cause "[b]ecause Plaintiffs have always been on notice of Defendants' statute of limitations defense"). If the party seeking to modify the scheduling order to amend its pleadings demonstrates good cause under Rule 16(b), then it must also demonstrate that the amendment is proper under Rule 15 standards. *See Mammoth Recreations*, 975 F.2d at 608.

Here, the Parties do not dispute that the executive exemption defense could have been raised at the outset of litigation. This means the proposed amendment could have been made over four years ago, in 2018—far past the reasonable amount of time to amend. *See AmerisourceBergen*, 465 F.3d at 953 (noting that an eight-month delay between the time of obtaining a relevant fact and seeking leave to amend was unreasonable).

However, from early on, Plaintiffs have been on notice that Defendants were raising the executive exemption defense and have been litigating this case as though the defense were properly raised. Plaintiffs' First Set of Special Interrogatories, served on February 9, 2018, contained specific requests about exemption. ECF No. 273-2 at pp. 27–28 (Interrogatory Nos. 9–13). For example, Special Interrogatory No. 10 requested: "If PNS Stores, Inc., contends that its Store Managers who are employed within the State of California are exempt employees, please state all facts which support PNS Stores, Inc.'s, claim of exemption." *Id.* at p. 27. PNS responded by denying that anyone had a job title of "Store Manager," but provided a description about the exempt responsibilities of STLs. *Id.* at pp. 39–40. Plaintiffs proceeded to conduct additional discovery related to exemption. *See* ECF No. 273-2 at pp. 72–73 (PNS's Amended Responses to Plaintiff's Notice of Deposition dated July 6, 2018); *id.* at pp. 82–84 (Deposition Transcript of William Boas dated September 13, 2018).

Moreover, the exemption defense was the focus of Defendants' 19 Summary Judgment Motions, and at no point in their opposition papers did Plaintiffs argue that the defense was inappropriately raised. To the contrary, Plaintiffs submitted extensive briefing on this issue. *See* ECF Nos. 207–23, 225–26. Plaintiffs' own "Master Separate Statement of Facts in Opposition to All Nineteen (19) Rule 56 Motions" acknowledges: "DISPUTED that STLs are actually exempt employees." ECF 224 ¶ 17. In light of these facts, the Court finds that Plaintiffs were on notice of Defendants' exemption defense—the central issue in this case—and good cause exists for leave to amend.

The Court concludes that leave to amend would also be proper under the Rule 15 standards for amendment. Under Rule 15, the Court considers five factors in determining whether a motion for leave to amend is appropriate: "bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the [pleading]." *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004). Among these factors, "it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). In addition to lack of prejudice, there is no evidence of bad faith in failing to plead the defense. Nor would amendment be futile; if proven at trial, the exemption defense will be dispositive of the claims at issue.

Accordingly, the Court grants Defendants' request to amend their Answer (ECF No. 273) and further considers the affirmative defense of exemption in determining the merits of Defendants' Summary Judgment Motions below. The Court declines Plaintiffs' request that discovery be reopened in the absence of good cause.[12]

---

[12]     In opposing Defendants' Motions for Summary Judgment, Plaintiffs did not argue pursuant to Federal Rule of Civil Procedure 56(d) that additional facts were needed to oppose summary judgment on the exemption defense. Plaintiffs assert that they have "only had sufficient discovery *to respond to the pending summary judgment motions*." ECF No. 280 at 20. Plaintiffs argue that additional discovery is necessary to afford them "an opportunity to prepare for a *trial* at which the Jury will *weigh* the evidence and will *not* be

### III.   Legal Standard for Summary Judgment

Defendants move for summary judgment as to all claims for each of the 19 Plaintiffs. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although materiality is determined by substantive law, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.' In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)) (internal citations omitted).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at

---

required to accept all of Plaintiffs' evidence as true." *Id.* at 21. This distinction is unpersuasive, particularly in the absence of any particularized discovery requested.

324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324 (internal quotation marks omitted); *see Anderson*, 477 U.S. at 248. Accordingly, the non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] upon mere allegations or denials of his pleading." *Anderson*, 477 U.S. at 256.

## IV.   Plaintiffs' Claims One, Two, and Three: The Executive Exemption Defense

### A.   Applicable Law

Claims One through Three relate to overtime compensation.[13] California law requires overtime pay for employees who work more than eight hours in one workday or 40 hours in one workweek. Cal. Lab. Code § 510(a). However, the California Legislature authorized the Industrial Welfare Commission ("IWC") to establish exemptions for various categories of employees, including an "executive" exemption, within certain statutory limitations. Cal. Lab. Code § 515(a). Under that authority, the IWC promulgated several wage orders, codified in the California Code of Regulations, setting forth criteria for determining whether an employee may be classified as an exempt executive. *See* Cal. Code Regs., tit. 8, §§ 11010 *et seq*. As relevant to this case, IWC wage order No. 7-2001 ("Wage Order 7") governs employees in the "mercantile industry." Cal. Code Regs., tit. 8, § 11070. Wage Order 7 provides the executive exemption applies to an employee who meets all of the following six requirements:

---

[13]    Claims One and Two are statutory and regulatory overtime violation claims. *See* California Labor Code §§ 510(a) and 1194; Cal. Code Regs., tit. 8, § 11070(4) ("Section 4 of Wage Order 7"). Claim Three seeks restitution damages for unpaid wages. S*ee* Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

(a)     Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and

(b)     Who customarily and regularly directs the work of two or more other employees therein; and

(c)     Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d)     Who customarily and regularly exercises discretion and independent judgment; and

(e)     Who is primarily engaged in duties which meet the test of the exemption. . . .

(f)     Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment.

Cal. Code Regs. tit. 8, § 11070(1)(A)(1)(a)–(f).

Here, Plaintiffs concede that all but one of the six requirements for the executive exemption are met. *See* ECF No. 224 ¶¶ 18, 20–22, 230. At issue is the fifth requirement: That each Plaintiff was "primarily engaged in duties which meet the test of the exemption."

"Primarily" means "more than one-half the employee's work time." Cal. Code Regs. tit. 8, § 11070(2)(K). The regulations require an examination of the "work actually performed by the employee during the course of the workweek" and "the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job." *Id.* § 11070(1)(A)(1)(e).

As to the distinction between "exempt" and "nonexempt" work, Wage Order 7 provides that those terms "shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order [the year 2001]: 29 C.F.R. Sections 541.102, 541.104-111, and 541.115-116." Cal. Code Regs., tit. 8, § 11070(1)(A)(1)(e).

Under the federal regulations effective as of 2001, "[i]n the vast majority of cases[,] the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption." 29 C.F.R. § 541.102(a) (2001). Such functions include:

> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

*Id.* § 541.102(b) (2001). Also considered exempt are tasks that are "directly and closely related" to the management of a department and the supervision of employees. *Id.* § 541.108 (2001). This phrase "brings within the category of exempt work not only the actual management of the department and the supervision of the employees therein, but also activities which are closely associated with the performance of the duties involved in such managerial and supervisory functions or responsibilities." *Id.* § 541.108(a) (2001).

Nonexempt work includes all other work. "Nonexempt work is easily identifiable where, as in the usual case, it consists of work of the same nature as that performed by the nonexempt subordinates of the 'executive.' It is more difficult to identify in cases where supervisory employees spend a significant amount of time in activities not performed by any of their subordinates and not consisting of actual supervision and management. In such cases[,] careful analysis of the employee's duties with reference to the phrase 'directly and closely related . . .' will usually be necessary in arriving at a determination." *Id.* § 541.111(b) (2001).

15

California courts have drawn several principles from these regulations. Work of the same kind performed by a supervisor's nonexempt employees generally is "nonexempt," even when that work is performed by the supervisor. *Heyen v. Safeway, Inc.*, 216 Cal. App. 4th 795, 822 (Ct. App. 2013). Every discrete task must be separately classified as either "exempt" or "nonexempt"—a task cannot be both at the same time. *Id.* But the same task may be deemed either "exempt" or "nonexempt" depending on the purpose the task serves within the organization. *Id.* For example, in a large retail establishment, a manager's participation in making sales to customers is nonexempt, unless the sales are made for "supervisory training or demonstration purposes." *Id.* at 823 (quoting 29 C.F.R. § 541.108(e) (2001)).

Under California law, the inquiry is quantitative in nature; "the Court must determine whether . . . [employees] spend more than 51% of their time on managerial tasks in any given workweek." *Dunbar v. Albertson's, Inc.*, 141 Cal. App. 4th 1422, 1426 (Ct. App. 2006). But as discussed above, Wage Order 7 also looks to consideration of the "employer's realistic expectations and the realistic requirements of the job." Cal. Code Regs. tit. 8, § 11070(1)(A)(1)(e). This includes consideration "whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." *Heyen*, 216 Cal. App. 4th at 828 (quoting *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 801-02 (1999)).

## B.   Plaintiffs' Time Spent

Each Plaintiff alleges misclassification as an exempt employee, in that he or she spent the majority of the workweek on nonexempt manual tasks. *See* ECF Nos. 207–26. The evidence of how Plaintiffs actually spent their work time turns largely on their declarations and deposition testimony. Plaintiffs attested that they spent between 60 and 90 percent of their time on such tasks:

| Plaintiff | Percentage of Time Spent on Manual Tasks | Source |
|---|---|---|
| Arredondo | 80% | ECF No. 226-1 ¶ 81 |
| Davis | 70% | ECF No. 225-1 ¶ 101 |
| DeForeest | 90% | ECF No. 223-1 ¶ 136 |
| Duba | 80% | ECF No. 222-1 ¶ 131 |
| Hall | 80% | ECF No. 221-1 ¶ 92 |
| Kilgore | 75% | ECF No. 220-1 ¶ 89 |
| Lopez | 75–80% | ECF No. 219-1 ¶ 137 |
| Mejia | 70–75% | ECF No. 218-1 ¶ 125 |
| Seltzer | 80–90% | ECF No. 217-1 ¶ 65 |
| Sharma | 60–70% | ECF No. 216-1 ¶ 177 |
| Smith | 60% | ECF No. 215-1 ¶ 84 |
| Toft | 65% | ECF No. 214-1 ¶ 91 |
| Tolliver | 75% | ECF No. 213-1 ¶ 132 |
| Viramontes | 80–90% | ECF No. 212-1 ¶ 81 |
| Walters | 75–90% | ECF No. 211-1 ¶¶ 63–64 |
| Warner | 75% | ECF No. 210-1 ¶ 105 |
| Wellons | 80–90% | ECF No. 209-1 ¶ 126 |
| Williams | 65–70% | ECF No. 208-1 ¶ 175 |
| Wright | 80–85% | ECF No. 207-1 ¶ 67 |

Defendants argue that these statements are conclusory, self-serving, and unreliable. For certain Plaintiffs, Defendants also point to other sworn statements by those Plaintiffs that is in tension with, or contradicts, the estimates listed above. Defendants have not presented independent evidence establishing the hours each Plaintiff spent on exempt tasks. The question, therefore, is which statements to credit and what inferences to draw from the testimony at issue.

At the summary judgment stage, Defendants bear the burden of proving the absence of a genuine issue of material fact on their exemption defense. The Court cannot resolve conflicting testimony in Defendants' favor, but instead must draw all justifiable inferences in favor of the non-moving party. *See Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1051 (9th Cir. 2015) (holding that on summary judgment, a court must construe all evidence "in the light most favorable to the non-moving

party"). For some Plaintiffs, the categorization of a particular task as exempt or nonexempt will depend not only on the nature of the task, but also on the purpose for which it was being performed on a given occasion. *See Safeway Wage & Hour Cases*, 43 Cal. App. 5th 665, 679 (2019) ("[W]here employees engage in concurrent performance of exempt and nonexempt work, categorization of that time will depend on their purpose in undertaking the activity."). There is plainly a genuine dispute of material fact here as to whether Plaintiffs spent a majority of their time on exempt tasks.

## C.   Defendants' Realistic Expectations

Defendants contend that, regardless of how Plaintiffs actually spent their time as STLs, Defendants realistically expected that STLs would spend most of their time on exempt tasks. But Defendants' briefs do not identify any communication that clearly contains such an instruction to all STLs.

For example, a document entitled "Week in the Life of the Store Team" identifies the "primary responsibility" of an STL as "lead[ing] store operations," and identifies the first of eight focus areas as "MOD," that is, serving as the "Manager on Duty." ECF No. 120-12. Another document, entitled "The MOD Program," instructs that "[t]he MOD is the most important role in the store," and that, "[w]e expect the MOD to constantly: [1] Move throughout the store to remain visible to [the customer] and associates; [2] Observe associate effectiveness and product availability; [and] [3] Direct action to impact [the customer's] experience and drive sales." ECF No. 120-6 at 6. The document continues, "[w]e often refer to this as a figure eight. A figure 8 is a description of your potential movement through the store that allows you to observe and direct action." *Id.* Defendants provide training slides reflecting an expansion of the MOD program, such that an STL would be assigned to the MOD role 66 percent of the time. ECF No. 127-3 at p. 132.

The Court agrees with Defendants that the MOD role, as prescribed by Defendants, correlates positively to exempt work. But even if Defendants expected STLs to "lead" and to spend most of their time acting as the MOD, and STLs understood such an expectation, this expectation does not exclude performing manual tasks while serving in that role. There

remains a genuine dispute of material fact as to whether Defendants communicated to Plaintiffs an expectation that they spend most of their time on exempt tasks.

Additionally, there is a genuine dispute of material fact as to whether such expectations were realistic. There is evidence that Plaintiffs, variously, found that the actual demands of the STL job required them to spend the majority of their time on manual tasks, including because (1) Defendants' labor budgets were inadequate; (2) Plaintiffs requested additional labor hours but were often denied; (3) Plaintiffs were told by supervisors not to request additional labor hours; (4) Plaintiffs were specifically directed by supervisors to perform manual tasks at their own stores or others; or (5) Plaintiffs received evaluations that recognized them for their willingness to perform manual tasks, or that did not fault them for time spent on manual tasks. Defendants have alternative interpretations of this evidence and argue that these instances represent a failure to manage or delegate on the part of the Plaintiffs. But again, on Defendants' motions seeking summary judgment on their affirmative defense, the Court must draw the inferences in favor of Plaintiffs.[14]

---

[14]    Defendants contend that the report of their expert Rebekah Smith (ECF No. 122-4) shows that (1) Plaintiffs worked with multiple associates to whom they could delegate manual tasks; (2) Plaintiffs underutilized allotted labor hours; and (3) the labor budget did not decrease over the years. *See* ECF No. 122-4. The Smith report, however, does not warrant summary judgment for Defendants.

Significantly, the Smith Report fails to show what the actual labor budget was for each store during the relevant time period and how they were sufficient. Table 8 indicates that Plaintiffs were working with at least two or more associates over 80 percent of the time. *See* ECF No. 122-4 at 13. But the fact that Plaintiffs were usually working with other associates does not demonstrate that there were enough associates for Plaintiffs to be able to dedicate most of their time to exempt, managerial tasks.

Table 9, on which Defendants rely to argue that Plaintiffs underutilized their labor hours, totals hours over multiple years and does not indicate how hours were provided or utilized week to week. Nor does the data indicate what type of labor hours were underutilized. As discussed below, multiple Plaintiffs testified that because hours were allocated to specific roles or departments, they were unable to schedule associates freely as the need arose.

The Court summarizes below evidence from each Plaintiff relating to the demands of the STL position or the sufficiency of the labor budgets, and whether Defendants' expectations with regard to exempt work would be realistic.

/ / /

Defendants further rely on the Smith Report to show that each store had, on average, a weekly labor budget of approximately 500 hours, "enough to schedule 12 full-time employees and 1 part-time employee." *See* ECF No. 212-1 ¶ 86. It is unclear from the Smith Report or Defendants' briefing how this 500-hour estimate was calculated. Given that each Big Lots store varied in size, number of employees, volume of sales, and merchandise carried, among other things, Defendants' 500-hour estimate fails to provide any insight into the labor budgets' adequacy. *See* ECF No. 224 ¶¶ 726–728. It is also unclear whether Defendants could realistically expect STLs to hire 12 full-time employees for their stores. For example, Plaintiff Lopez testified that apart from two Assistant Team Leaders, the Dock to Stock Lead, and the Furniture Sales Lead, his team comprised part-time associates working three-to-four-hour shifts. *See* ECF No. 219-1 ¶ 155. Plaintiff Williams similarly testified that most of his associates worked part-time. *See* ECF No. 208-1 ¶ 217. Further, multiple Plaintiffs, including Williams, cited difficulty scheduling various part-time associates and hiring associates at minimum wage. *See, e.g.*, ECF No. 208-1 ¶ 218 (Williams); ECF No. 221-1 ¶¶ 114, 116 (Hall).

The Smith Report also fails to show that the labor budget remained consistent (or at least, did not decrease) for each Plaintiff's store throughout the period at issue. Plaintiffs Sharma, Toft, and Warner testified that the Store Revolution resulted in fewer labor hours for their respective stores. *See* ECF No. 224 ¶ 705. To refute this claim, Defendant cite Chart 1 of the Smith Report, which reflects that the average number of hours worked per store per month from February 2014 to April 2018. *See* ECF No. 122-4 at 16. However, Chart 1 incorporates data across all the Big Lots stores that Plaintiffs worked at—not the data as it relates to each store individually. Even had Defendants provided that store-specific information, it is unclear how the "average number of hours worked" relates to the labor budget, if at all.

Finally, Plaintiffs dispute that the data in the Smith Report is reliable. *See* ECF No. 224 ¶ 609. For example, Dr. Manivannan Alagarsamy, a former DTL and current Regional Market Team Leader, testified that the payroll reports did not necessarily reflect the actual number of labor hours for a given store. *See* ECF No. 224 ¶ 608. These "payroll reports," also called the "Model Hours Report," purports to show the number of labor hours by which a store either underspent or overspent its allotted labor budget. *Id.* ¶ 607. Like Alagarsamy, Plaintiff Mejia disputed the accuracy of the Model Hours Reports, testifying that they would not show additional hours that were granted or any hours reduced. *Id.* ¶¶ 613–15.

### 1.     Cristal Arredondo (ECF No. 136)

Arredondo worked from 2014 to 2015 at the Big Lots store in Chula Vista, California. ECF No. 136-1 ¶ 7. Arredondo testified that Defendants did not provide enough labor hours to complete all tasks without the STL's involvement in manual tasks. *See* ECF No. 226-1 ¶¶ 136, 154. As a result, Arredondo testified that she had to unload trucks, help customers as a salesclerk, operate a cash register, take out the trash, and other manual tasks. *See id.* ¶¶ 133, 170, 172, 175–77, 183, 185, 187. According to her initial declaration, Arredondo also told her supervisor, DTL Edward Scott Kidd, on at least fifteen occasions that her job was "too physical" and that she was having to do "a lot of physical work." *See* ECF No. 136-5 ¶ 16. Arredondo confirmed at her deposition that she discussed this issue with Kidd, even as she was resigning, but he told her "it's not going to change, that's the expectations of Big Lots and that's the way it is." *See* ECF No. 197 at 206:10–19.

Kidd's deposition testimony also appears to corroborate Arredondo's testimony. Kidd conceded it was difficult to "put a percentage" on how much time STLs spent on manual tasks, but he believed that the labor budgets were deficient for some stores. *See* ECF No. 226-1 ¶ 206. Specifically, he testified that Big Lots stores in California did not allow the possibility of associates earning five hours of overtime, unlike the stores in other states. *See id.* As a result, the lack of five hours in the budget meant less labor for each "key carrier" (i.e., assistant store manager, Dock to Stock Lead, or Furniture Manager). *See id.*; ECF No. 224 ¶ 637. Kidd "absolutely" agreed that "some [stores] don't get enough hours," causing STLs to spend "more than half their time" on manual tasks. *Id.* ¶ 546.

### 2.     Samye Davis (ECF No. 126)

Davis began working for Defendants in 2011 as an STL at Big Lots store in the Chula Vista, California. ECF No. 126-1¶¶ 1–2. She transferred in 2014 to the National City, California store, where she worked until she left the company in 2018. *Id.* ¶¶ 3–4.

Davis testified that the National City store had a growing sales volume due to the expansion of its furniture department, but it did not receive additional hours on an ongoing basis. *See* ECF No. 192 at 73:5–23; ECF No. 225-1 ¶ 135. Despite requesting more labor

hours "every week at least," Davis estimated that she only received them about 15 percent of the time. *See* ECF No. 225-1 ¶¶ 132–33. She also testified that her supervisor disciplined her for exceeding the allocated hours. *See id.* ¶ 136.

Further, Davis was often the only person available to complete manual tasks. Davis testified that never had a full team of managers at the store. *See* ECF No. 225-1 ¶ 111. She explained that the store did not have a Furniture Manager "for a very long time," and, at times, did not have a Dock to Stock Lead or Assistant Managers. *See id.* Approximately 40 to 50 percent of the time, the furniture trucks would arrive after the Dock to Stock team left and before the Furniture Manager arrived. *See id.* ¶ 131. On one such day, Davis was the "only one there to unload" 120 mattresses. *See id.* Other times, Davis would have to cover for hourly employees when they went on breaks because there would be no one else in the store. *See id.* ¶ 112.

### 3.    Tommy DeForeest (ECF No. 124)

DeForeest began working for Defendants in 2005 as an Assistant Team Leader at the Big Lots store in Oceanside, California. ECF No. 124-1 ¶ 1. He was promoted to STL within a few months and then transferred to the San Marcos, California store a year later. *Id.* ¶¶ 3–4. In 2007, he was transferred again to the Escondido, California store, where he worked until his retirement in 2014. *Id.* ¶¶ 5–6.

DeForeest testified that, while there were 25 employees "on the payroll," these employees were not all working at once. *See* ECF No. 223-1 ¶ 9. DeForeest typically had just four other people working with him. *See id.* ¶ 10. DeForeest testified that he "always" asked for more labor hours, but he "rarely" received them. ECF No. 191 at 75:20–23. When he did receive additional hours, they were limited to holidays, large deliveries, or store reorganization and not offered on an ongoing basis. *See* ECF No. 223-1 ¶¶ 94–95. DeForeest acknowledged that labor budget increased once in 2014 as the volume of sales went up. ECF No. 191 at 75:20–76:15, 101:23–102:6. But he specified that the increased hours were "put into the full furniture department" and was only available for that year. *Id.* at 102:4–6.

DeForest also testified that multiple times in 2014, his supervisor would direct him to help at other stores with manual tasks, such as driving trucks and transporting merchandise. *See* ECF No. 223-1 at ¶¶ 163–66. Two of these instances were week-long assignments. *Id.* ¶ 166.

### 4.    William Duba (ECF No. 129)

Duba worked from July 2013 to October 2017 as the STL of the Big Lots store in Lodi, California. ECF No. 129-1 ¶¶ 1–2; ECF No. 222-1 ¶ 124. Duba testified that he was unable to delegate all the manual work to hourly employees "[b]ecause there [were] more tasks than employees to complete the tasks." ECF 222-1 ¶ 179. Multiple times, on a regular basis, Duba complained to his supervisor about the labor budgets and requested more hours be allotted to the store, but he was told to "work with what [he] had." *See id.* ¶¶ 182, 188.

Nevertheless, Duba consistently received positive performance evaluations. *See* ECF No. 129-3 at pp. 159–83. Although Duba's supervisor noted in his 2014 evaluation that he could "do better if [he] develop[ed] a daily/weekly routine that incorporates a delegation and follow up with [his] management team," *see id.* at p. 160, his subsequent evaluations indicated that his performance was improving and consistently above average. *See id.* at pp. 163, 170, 173. For example, Duba received a "Very Good" rating in 2015, an "Exceeds Expectations" rating in 2016, and a "Far Exceeds Expectations" rating in 2017. *See id.* at pp. 163, 180.

In addition, Duba testified that STLs were referred to as "free labor" and that his DTL directed him to travel to other stores to perform manual labor on about 15 occasions.[15] *See* ECF No. 222-1 ¶¶ 169–71. Duba testified that he did not have any role in supervising the staff when visiting other stores, and that he functioned as "extra labor, extra help." *Id.*

---

[15]    Defendants contend that some of these instances fall outside the statute of limitations. *See* ECF No. 249 at 6. Regardless, this evidence is relevant to the demands of the STL position during Duba's employment and whether Defendants' expectations were realistic.

¶ 174. In one performance evaluation, Duba's supervisor even commended Duba for "his willing to help out in other stores when asked." *See* ECF No. 129-3 at p. 170.

### 5.   Sylvia Hall (ECF No. 130)

Hall worked from June 2015 to July 2016 as the STL at the Big Lots store in Huntington Beach, California. ECF No. 130-1 ¶¶ 1–2. Hall testified that DTL Rebecca Koliboski told STLs "on every conference call" not to ask for additional labor hours and to "[w]ork with what you have." *See* ECF No. 221-1 ¶¶ 143–44; ECF No. 185 at 83:4–18. Further, in Hall's sole performance evaluation, she was directed to "work on maximizing the team[']s effective [*sic*] by adopting a participative style of management." *See* ECF No. 130-4 at p. 82. Hall testified during her deposition that she understood this to mean that she was expected to work "hands-on alongside with [her] team," including stocking shelves, selling, unloading the truck, and taking out the trash. ECF No. 221-1 ¶¶ 140–41; ECF No. 185 at 241:15–242:3.

### 6.   Garrick Kilgore (ECF No. 122)

Kilgore worked from October 2016 to October 2017 as the STL of the Big Lots store in Merced, California. ECF No. 122-1 ¶¶ 1–2. Kilgore succeeded Plaintiff Lopez as STL of the Merced store. *See id.* ¶ 86.1. Kilgore testified that he had to spend most of his time on manual tasks. *See id.* ¶¶ 86.2, 88.

Kilgore acknowledged that he knew Defendants expected him to spend 66 percent of his time as the MOD, but "reality [was] something different." *See* ECF No. 182 at 107:3–14. Kilgore testified that, in particular, the freight process consumed a lot of labor hours at the Merced store. *See* ECF No. 220-1 ¶¶ 90, 100–01. Kilgore explained that the number of pieces delivered to the store determines the number of labor hours received for the freight team. *Id.* ¶ 102. However, the "piece count" information for a particular truck would not be available until the day before, making it difficult to schedule associates. *Id.* Kilgore further testified that he did not have flexibility to schedule additional associates to help with deliveries given the labor budget constraints:

They don't give you hours for that. You have those days scheduled, period, that's it, end of story. There's [*sic*] no hours. You're not budgeted for those hours. So if you want to have people throwing fr[e]ight all day, you won't have any cashiers. You won't have anybody in furniture. You won't have anybody on the sales floor. . . .

*See id.* ¶ 98.

In a declaration, Kilgore stated that he notified his supervisor that the labor budget was insufficient to operate the Merced store, but he was told to work with the hours he was given. *Id.* ¶ 111. Kilgore confirmed in his deposition that he raised his concerns about the labor budgets to his supervisor. *See* ECF No. 182 at 182:4–8.

### 7. Nathaniel Lopez (ECF No. 133)

Lopez worked from April 2012 to June 2016 as the STL for the Big Lots store in Merced, California. ECF No. 133-1 ¶¶ 1–2. Lopez testified that the "amount of physical work that had to be done and the amount of hours that they had allocated to [his] store wasn't sufficient, so [he] had to step in and use [his] time . . . and still try to do all [his] managerial stuff as well." *See* ECF No. 180 at 280:4–14. Lopez explained that he typically had only two associates working at the same time as him, and for the large part, they comprised of "one cashier and one person on the floor recovering [or] helping customers." *Id.* at 275:19–24. Apart from two Assistant Team Leaders, the Dock to Stock lead, and the Furniture Sales Lead, Lopez's team was made up of part-time associates working three-to-four-hour shifts. *See* ECF No. 219-1 ¶ 155. There were also times when Lopez was directed to help with manual labor at other Big Lots stores. *See id.* ¶¶ 179–80.

Lopez also testified that he told his supervisor multiple times that the Merced store needed more labor hours "due to the amount of freight [it] was getting in," but the labor budget had been "cut by 80 hours over two years." *See* ECF No. 180 at 82:15–84:9, 269:8–13. Although Lopez acknowledged that he could ask for additional labor hours and was not reprimanded for exceeding the labor budget (*see* ECF No. 133-1 ¶¶ 111–12), he testified that he did not receive them for increased freight:

. . . . The schedules [for the associates] were posted in advance and the notice of the freight came right before the truck would get there [to the store], and so we would have an additional amount of freight and we're not given any additional hours to stock the freight.

ECF No. 180 at 178:2–14. Lopez also testified that he did not have discretion to increase labor hours. *Id.* at 84:10–25.

### 8.     Saul Mejia (ECF No. 128)

Mejia worked from February 2016 to August 2017 as the STL of the Big Lots store in La Habra, California. ECF No. 128-1 ¶¶ 1–2. Mejia testified that, after his first few weeks at the La Habra store, he learned that he "had to spend a lot more time doing labor than managing." ECF No. 218-1 ¶ 122. Mejia explained that he initially "attempted to manage a lot more," but he was only "able to upkeep the store because [he] overspent on labor." *See id.* ¶ 123. Mejia testified that he "drastically" exceeded the allotted labor hours in the first two or three weeks because he mistakenly believed his labor budget was larger. *See id.* ¶ 120.

Further, the La Habra store received several different kinds of delivery trucks that required a lot of labor hours. *See* ECF No. 218-1 ¶¶ 128–33. Every week, Mejia's store received one Distribution Center truck; three to four dairy trucks; five to ten "direct to store delivery" trucks (i.e., delivery from product manufacturers); one or two furniture trucks; and one or two mattress trucks. *See id.* ¶¶ 129–33. The Distribution Center trucks arrived each week at 3 a.m., and though the Dock to Stock team would "try to get it all done," Mejia testified that "it was never all done, considering the allocated hours." *Id.* ¶ 129. So, Mejia explained, the managers had to step in and "pick[] up the slack." *See id.* Mejia also testified that, the first time he received a mattress truck, he complained to his supervisor, former DTL Alagarsamy, about having to unload around 20 mattresses by himself. *See id.* ¶ 135. According to Mejia, Alagarsamy responded, "[W]ell that's how we operate stuff. You have to do it." *See id.*

18-CV-02913-RSH-DEB

Although Mejia's store had a full roster of employees, Mejia explained that "if you don't have the allocated hours of labor to run your business, it's a different story," and that "[y]ou can have all the people in the world that you want or need, but if the labor plan doesn't call for that, it doesn't align." *See id.* ¶ 147. Mejia asked his supervisors for additional hours about five times early in his employment, but all requests were denied. *See id.* ¶ 171. In a declaration, Mejia stated that he told Alagarsamy that the store should have at least a cashier, a floor person, a furniture person, and a manager, but Defendants' labor budgets did not provide enough labor hours for such staffing. *See id.* ¶ 159. Mejia testified that ultimately the MOD was responsible for various manual tasks, such as unloading trucks, running the register, and taking out the trash. *See id.* ¶¶ 134, 138–39, 141. For example, there would not be enough employees when the dairy trucks arrived, so the MOD would have to "manually rotate, get the expired product out, process it, put it on the shelves, which [was] a lengthy process." *See id.* ¶ 140. Mejia testified that he, as MOD, would also cover hourly employees "every single day" during their breaks. *Id.* ¶¶ 143–55.

Nevertheless, in his 2017 performance evaluation, Alagarsamy gave Mejia a "Meets Expectations" rating and provided no feedback regarding the amount of manual taskwork Mejia was doing as the STL. *See* ECF No. 218-3 at p. 131. To the contrary, Alagarsamy commented in the evaluation that he appreciated Mejia's "positive attitude and willingness to take on more administrative responsibility. *Id.*

### 9.    Tina Seltzer (ECF No. 137)

Seltzer worked for Defendants from 2006 to 2008 as a "Store Manager" and rejoined in 2012 at the Big Lots store in Vacaville, California. ECF No. 217-1 ¶¶ 1–2. In or around 2016, Seltzer transferred as STL to the Hercules, California store, where she worked until 2018. *Id.* ¶¶ 3–4.

Seltzer testified that given specific factors of her stores (e.g., the employee pool available in the community, the type of neighborhood, and the size of the store) and the labor budgets, it was not possible for her to operate her stores without spending most of her time on manual tasks. *See* ECF No. 201 at 256:21–257:3. While Seltzer acknowledged

that hiring was one of her responsibilities, she testified that "it was very difficult" to hire employees—especially, to work from 4 a.m. to 8 a.m. unloading trucks for minimum wage. *See id.* at 256:1–9. Seltzer testified that an attempt was made in later years to have the trucks arrive later, at 6 a.m. instead. *See id.* But this "didn't work" because "it ran into business and no one could be on the sales floor." *See id.* Seltzer also explained that she had "no control over" the pay of Assistant Managers, and she hired "everyone [else] at the minimum wage" because she "couldn't go above."[16] *Id.* at 260:3–7. She also testified that she also had to cover for nonexempt employees while they were on breaks. ECF No. 217-1 ¶¶ 115–16.

In or around 2016, following the Store Revolution, Seltzer admitted that she tried a "hands off" approach, but this led to "the store conditions falling." *Id.* ¶¶ 150–51. Seltzer explained that doing "figure 8s" as the MOD meant that she was doing "anything that needed to get done" in the store, including manual tasks like cashiering and cleaning. *Id.* ¶¶ 119, 212. Although there was no increase to the labor budgets, Seltzer testified that the Store Revolution increased the amount of manual work that had to be done due to changes in the Dock to Stock process. *See id.* ¶¶ 154–55. Further, Seltzer testified that her DTLs instructed her to travel to other Big Lots stores to perform manual work multiple times from and after January 2014. *Id.* ¶ 140. On one such occasion, she did manual tasks for an entire week at the Redding, California store. *Id.*

Although Seltzer's 2014 annual performance evaluation stated that she "Requires Improvement," her ratings improved in subsequent evaluations. *See* ECF Nol. 137-4 at pp. 99–123. Her supervisor gave her a "Meets Expectations" rating in her 2017 evaluation, commenting that she had "shown good leadership" and "improved her skills in many ways

---

[16]     Seltzer testified that, at most, if a candidate was a "super stocker," she could call the District Manager to request a 50-cent increase over the minimum wage. *See* ECF No. 217-1 ¶ 139.

to become a more effective leader." *Id.* at p. 120. Notably, none of these evaluations stated that Seltzer should be doing less manual work.

### 10.   Satya Sharma (ECF No. 138)

Sharma began working for Defendants in 1984. ECF No. 138-1 ¶ 1. During her tenure, she was a cashier, Customer Service Manager, Assistant Team Leader, and STL at various locations. *Id.* ¶¶ 2–4. She was the STL for the Big Lots store in Fountain Valley, California from 2007 until her retirement in June 2017. *Id.* ¶¶ 5, 8.

Sharma testified that Defendants' expectations were unrealistic because there were not "enough hours." ECF No. 171 at 304:9–17. Sharma explained that certain tasks, such as emptying the warehouse or completing the Dock to Stock process, needed to be done "regardless [of whether] . . . you have employee[s] or you don't have the hours to do it." *Id.* at 307:18–308:4. Sharma received more labor hours on only one occasion, despite multiple requests. ECF No. 216-1at ¶¶ 196–97. To the extent Sharma "used fewer labor hours than Big Lots provided," see ECF No. 229 at 5, Sharma testified that she was not permitted to rollover any unused hours to later weeks or move hours from one function to another function. *See* ECF No. 216-1 ¶¶ 194–95.

Sharma also testified that the 2015 Store Revolution resulted in "more stingy" labor hours and her doing more manual tasks. ECF No. 171 at 323:2–15. Specifically, in 2015, her supervisor, DTL Koliboski, pulled one of the Assistant Managers from her store, forcing Sharma to complete some of the manual work that her Assistant Manager would normally have done. *See* ECF No. 226-1 ¶ 200. Sharma testified that she was directed not to use the labor hours left by the Assistant Manager's absence. *Id.* ¶ 201. Then Sharma's Dock to Stock Lead resigned in 2016, and that position remained unfilled for three or four months, which led Sharma to fill in for that role. *See id.* ¶ 202. Although Sharma did not provide specific dates, these instances appear to coincide with the period when Defendants adopted the Store Revolution.

/ / /

/ / /

29

### 11. Jacqueline Smith (ECF No. 127)

Smith worked at the Big Lots store in Roseville, California from 1991 to July 2017, when the Roseville store closed. ECF No. 118-1 ¶ 1–2; ECF No. 215-1 ¶ 117. She became the STL in or around 2000. ECF No. 118-1 ¶ 3.

Smith testified that she was unable to spend the majority of her time on managerial tasks or delegate the manual tasks she did to other employees because the labor budget was insufficient. *See* ECF No. 215-1 ¶¶ 135, 139–41. She confirmed that the budget provided a certain number of labor hours "for different types of things, like truck hours, furniture hours, [and] stuff like that," but she did not have discretion to move hours from one type to another. *Id.* ¶ 142. Further, the hourly employees in her store "had their own tasks to do." *Id.* ¶ 136. This resulted in Smith having to stock shelves, work on planograms,[17] do recovery, put out freight, run the cash register, and complete Never Outs, among other tasks. *Id.* ¶¶ 122, 141, 146–49. Smith believed she was required to complete tasks that associates did not complete at the end of the day or shift because, otherwise, she would be "yelled at." *See id.* ¶ 153.

In addition, Smith testified that she spent up to seven hours per week just on unloading trucks. *Id.* ¶ 126. She explained that her store would receive furniture trucks two to three times a week, but Defendants never provided the time frame within which the trucks would arrive. *Id.* ¶ 124. Smith testified that she unloaded these trucks "[m]ost of the time" with the help of other associates. *Id.* ¶ 125.

### 12. Karen Toft (ECF No. 135)

Toft worked as an STL from 2014 to 2016 at the Big Lots store in Rohnert Park, California. ECF No. 135-1 ¶¶ 1–2. Toft testified that her store was short-staffed for two reasons. First, it was difficult to hire and retain employees. *See* ECF No. 167 at 266:21–267:1. Second, there were not enough labor hours to complete all the manual tasks, such

---

[17] A "planogram," or "POG," is an image of how things should be displayed on a shelf. ECF No. 224 ¶ 253.

as "resets" and "truck processing." *See id.* Toft testified that she regularly complained to her supervisors about the amount of manual task work she had to do and the insufficiency of the labor budgets. *See* ECF No. 214-1 ¶¶ 145–47. Although Toft was "pretty outspoken" about these issues, the response she received was to "[j]ust do the best you can." *See* ECF No. 167 at 259:16–260:7.

Toft claims that her situation worsened over time. *See* ECF No. 214 at 11. Toft testified that she had to do more manual tasks over time due to the new Dock to Stock program, and that the Store Revolution resulted in a "more stingy" labor budget. ECF No. 167at 252:22–253:6; ECF No. 214-1 ¶ 151. Further, Toft's supervisor, DTL Bret Gardner, testified in his deposition that he "expected" Toft (as well as Plaintiffs Seltzer and Wright, who he oversaw) to spend most of her time on manual task work. ECF No. 188 at 29:11–24. Gardner also agreed that he expected STLs to spend most of their time on nonexempt work at least some weeks of the year. *Id.* at 30:4–7. Gardner confirmed that Toft "frequently verbalized her frustration with staffing, not having enough help, [and] not having enough payroll to complete jobs." *Id.* at 33:21–24.

Nevertheless, Toft received positive performance evaluations throughout her employment. *See* ECF No. 135-3 at pp. 262–71. In her first performance evaluation, her then-supervisor, John Hanson, recognized that Toft "took over a broken store and had to face all kinds of issues that left her very frustrated at times." *Id.* at p. 263. In a subsequent evaluation, Hanson commented that Toft "worked very hard to move thru the weak players and find the right type of associate[s] and managers to staff her store," despite a "difficult year due to a team that was filled with under performers." *Id.* at p. 270. Hanson further noted that Toft "took total accountability for everything in her[] store, many times when things were actually out of her control." *Id.*

### 13.   Charlisa Tolliver (ECF No. 131)

Tolliver worked from 2011 to 2016 as the STL of Big Lots stores in three California locations: Rancho Cucamonga, Fontana, and Cathedral City. ECF No. 131-1 ¶¶ 1–7. Tolliver testified during her deposition that she was often directed to travel to various stores

1    to perform manual tasks alongside other STLs. *See* ECF No. 166 at 206:1–7, 296:9–297:10,

2    298:6–300:11, 307:1–24. Tolliver explained that STLs would do the physical labor because

3    they were salaried employees and therefore "didn't hurt the budget for that store." ECF No.

4    213-1 ¶ 181. Each of these trips would span between a couple days to a full week. *See* ECF

5    No. 166 at 299:9–22.

6                 **14.  Manuel Viramontes (ECF No. 134)**

7        Viramontes worked for Defendants from 2013 to 2015 as the STL of Big Lots stores

8    at three California locations: San Juan Capistrano, Rancho Santa Margarita, and Laguna

9    Hills. ECF No. 134-1 ¶¶ 1–3. Viramontes testified that he could not "just schedule a bunch

10   more employees" when needed because he had to "maintain [] [his] allotment, [his]

11   allocation." *See* ECF No. 212-1 ¶ 106. When Viramontes exceeded his labor hour

12   allocation, his supervisor would call and tell him that he "needed to control that and not let

13   it happen." *See id.* ¶ 107. Further, Viramontes testified that on six or seven occasions, he

14   informed DTL Koliboski that the labor budget was insufficient to operate the store. *See id.*

15   ¶ 110. According to Viramontes, Koliboski also denied his multiple requests additional

16   labor hours, telling him that the labor budget "was already allocated" and "that's what

17   [they] have to work with." *See id.* ¶¶ 108–110.

18                 **15.  Michael Walters (ECF No. 132)**

19        Walters began working for Defendants in 2010 as an Assistant Store Team Leader.

20   ECF No. 132-1 ¶ 1. Walters became an STL in 2012 while working at the Big Lots store

21   in Sonora, California. *Id.* ¶¶ 3, 8. In 2014, he was transferred to the Stockton, California

22   store, where he continued to work as STL until 2018. *Id.* ¶¶ 9–10.

23        Walters testified that, at the Stockton store, he was short-staffed to receive and

24   unload Distribution Center trucks, which arrived weekly at 2:00 a.m. or 4:00 a.m. *See* ECF

25   No. 164 at 99:15–21, 110:17–111:9. When the trucks arrived, Walters testified that he

26   could not take someone off the sales floor to help because the unloading process would

27   finish when the store was closed, and there would be "no one to pull [off the sales floor.]"

28   *Id.* at 111:3–9. Walters explained that the labor budget was incorrect because it "didn't take

into consideration that . . . [there were] two trucks." *Id.* at 121:3–4. The same would also be true for the Dock to Stock process. Walters testified that he did not have enough labor hours to help, and he could not just add hours or adjust the schedule because it would hurt his customer service standards. *See id.* at 111:4–9. Walters' requests for additional labor hours were sometimes approved, but the Parties dispute whether these approvals were sufficient given the demands of the store. *See* ECF No. 211-1 ¶ 52.

Further, Walters testified that on multiple occasions he was directed to work at other Big Lots stores to help with manual tasks. ECF No. 164 at 170:23–172:2.. These sessions spanned from "a couple days" to "three months." *See id.*172:14–23, 173:9–10, 181:11–13. On one occasion, Walters was at the Merced, California store doing exclusively physical, manual labor for an entire week, "[m]oving fixtures, resetting furniture, and organizing the back rooms, at the instruction of DTL Robert Burkhalter. *Id.* at 172:18–173:5, 175:9–18 On another occasion, sometime between January and August of 2014, Walters spent three months doing "physical tasks" to help with the "[c]omplete remodels" of three stores in Northern California. *Id.* at 182:12–24. Walters testified that, during this time, he was not managing nonexempt employees in the remodel process.[18] *Id.*

### 16.   Laura Warner (ECF No. 125)

Warner worked began working for Defendants in 1996. ECF No. 125-1 ¶ 1. In 2009, she was promoted to STL of the Big Lots store in Yucca Valley, California store, where she stayed until 2015. *Id.* ¶¶ 2–3. Warner testified that it was necessary to spend 80 percent

---

[18]   Defendants ask the Court to find it was "likely . . . that Walters was directed to visit other stores to manage, lead, and oversee projects, but he chose to do manual work instead." *See* ECF No. 241 at 5. But unless Defendants can show otherwise, Walters's version of the facts "is to be believed." *See Anderson*, 477 U.S. at 255; *see also Muhammad v. Cardoza*, No. C-87-5933 EFL, 1993 WL 169288, at *4 (N.D. Cal. May 10, 1993) ("The party moving for summary judgment cannot sustain his burden merely by denying the allegations in the non-movant's pleadings.") (citing *Ross v. Int'l Bd. of Elec. Workers*, 544 F.2d 1022, 1025 (9th Cir. 1976)).

of her time on physical tasks to get the work done. *See* ECF No. 210-1 ¶¶ 104, 107. For example, she explained:

> There is no way that you could have planograms that are due by a certain date and time and [an] aisle change needed to be completed by a certain date and time. You could not just walk around the store. They didn't give you enough labor to have recovery associates to get the store totally recovered. So as we're doing our figure 8's we had to recover the store.

ECF No. 163 at 81:12–20.

In another example, Warner testified she spent around eight hours per day on manual labor during certain weeks when the Yucca Valley store received delivery trucks. *See id.* at 143:17–25. She informed her supervisors that she was spending her time this way. *See id.* at 146:18–148:6. But Warner's requests for more labor were usually denied. During her time as STL, Warner estimated she asked for additional labor hours "[m]aybe 30 times, 40 times," but quite often, the answer was no. *See id.* at 113:13–18.

Warner further testified that the Store Revolution changed expectations related to her job, restructured management, and slightly decreased labor budget—putting strain on the other managers and herself. *See id.* at 73:18–74:7, 86:1–13, 306:18–307:11. Warner testified that in 2015 there were increased restrictions in distribution of labor hours that prevented her from being able to use hours from one role to "compensate" for deficiencies in another. *Id.* at 115:3–116:13, 119:21–120:7. Despite these changes, Warner testified that she mostly did the same tasks from before the Store Revolution. *See id.* at 163:18.

### 17. Sean Wellons (ECF No. 123)

Wellons worked from 2010 to 2013 as the STL at the Big Lots store in Lodi, California. ECF No. 123-1 ¶¶ 13–14. In 2013, Wellons was transferred to the West Sacramento, California store, where he stayed until 2017. *Id.* ¶¶ 15–16.

Wellons testified that he had conversations "all the time" with his supervisor, DTL Hanson, about the amount of time he was spending on manual tasks, particularly freight and stocking. ECF No. 209-1 ¶ 164. Wellons testified that he requested "help in the way of hours," but there were not many times Hanson would provide additional labor hours.

*See id.* In fact, Wellons stated in a declaration that Hanson "regularly" directed him to travel to other stores to perform manual taskwork. ECF No. 123-3 at p. 260. Wellons confirmed at his deposition that he went to stores in Vacaville, Santa Rosa, Ukiah, Redding, and Rohnert Park, California. ECF No. 161 at 163:20–21. During these visits, which spanned up to multiple days, Wellons testified that he stocked freight, rebuilt fixtures, and unloaded trucks. *See id.* at 164:7–25, 166:2–3, 169:11–13, 170:14–18. Wellons also testified that, on one occasion when he was sent to the Redding store for a couple days, Hanson denied his request for extra labor hours to support his own store in his absence. *See id.* at 176:24–177:7

Further, Wellons's performance evaluations were consistently positive from 2014 to 2017. *See* ECF No. 123-3 at pp. 226–43. These evaluations did not address how Wellons was spending his time or instructed him to spend less time on manual tasks. To the contrary, it appears that Wellons's practice and leadership aligned with Defendants' expectations. In 2017, for example, Wellons's supervisor gave him a "Meets Expectations" rating and commented that Wellons was "a hands[-]on leader in his building and in the district." *See id.* at p. 240.

### 18. David Williams (ECF No. 118)

Williams began working for Defendants in April 2014 as an Assistant Team Leader at the Big Lots store in Tulare, California. ECF No. 118-1 ¶ 5. In November 2014, he was promoted to the STL position at the Tulare store. *Id.* ¶ 10. He transferred in 2015 to the Visalia, California store, where he worked until his termination in March 2017. *Id.* ¶¶ 10, 19, 157.

Williams testified that he was unable to spend the majority of his time on managerial tasks because "[i]t just wasn't realistic of what [Defendants] were asking for and what actually needed to be done at the store with the amount of hours that they gave us and just the amount of things that they kept putting onto our table . . . ." *See* ECF No. 160 at 304:19–24. Williams explained that he could not delegate certain manual tasks—such as stocking, recovery, or cleaning—to other employees due to the lack of staff and the "amount of hours

given to [the] store." *See id.*at 121:19–24, 126:8–22, 219:7–17. STL Yesel Gonzales, who trained Williams to be an STL, agreed in her deposition that "the only way that you can effectively manage . . . is if you, as an STL, are performing more than 50 percent of your time on manual labor." *See* ECF 187 at 199:9–13.

In particular, Williams testified that he did not have enough help unloading the delivery trucks, which required a lot of physical labor. *See* ECF No. 208-1 ¶¶ 203–06. Each week, Williams's store received three to four trucks from the Distribution Center, a mattress truck, and one to two furniture trucks. *Id.* ¶ 203. Though Williams would know the day when the trucks would arrive, Defendants would not provide the time in advance. *See id.* ¶ 204. This resulted in difficulty scheduling associates, who worked part-time and could "only able to be scheduled . . . three to four hours a day." *See id.* Williams also testified that mattress trucks could bring "anywhere from 100 mattresses all the way up to like 400 or 500 mattresses." *See id.* ¶ 205. Because Williams's store did not have a dock, mattresses had to be physically pulled off the truck and carried into the store. *See id.* Williams had to help because "a lot of the associates were [] older in age" and were "not physically able to take in a lot of these trucks." *See id.*

According to Williams, the insufficient labor budgets also presented a problem with respect to the Empower program, which would generate weekly schedules for his store. *See id.* ¶ 230. Because Empower would "always" schedule beyond the store's labor budget, Williams explained that he would have to "cut some of the hours to get into budget." *See id.* ¶ 231. In addition, Williams testified that STLs could not schedule freely because the labor hours were divided into specific categories, such as Dock to Stock, furniture, cashier, and recovery. *See* ECF No. 160 at 307:7–22. Williams explained that STLs were "[n]ot really" allowed to use hours from one category for another. *See id.* at 307:16–17.

Furthermore, Williams testified that his supervisor, DTL Alison Boer, directed him to do manual tasks at the Visalia store and others. *See id.* at 203:13–19, 227:18–228:2, 309:25–312:8. For example, when the Visalia store weas dealing with a "pest control" problem Williams testified that Boer told him to "come up with a plan and then execute

it." *See id.* at 311:3–4. Williams testified that, as a result, he spent most of his time over five to six months on manual tasks related to cleaning the store. *See id.* at 227:18–228:2. In a declaration, Williams also stated that Boer sent him to other stores in California to help with manual tasks. *See* ECF No. 208-1 ¶ 247. Boer even commented in his 2015 performance evaluation, that Williams was "willing to help out in the district when ever [*sic*] needed." *See id.* ECF No. 118-3 at p. 145. Notably, Boer gave Williams a "Good" overall rating and praised his leadership. *See id.* Boer did not comment on how much time Williams was spending on manual tasks or that he should be focusing more on managerial tasks.

### 19.    John Wright (ECF No. 121)

Wright worked from August 2014 to April 2017 as the STL at the Big Lots store in San Pablo, California. *See* ECF No. 121-1 ¶¶ 1–3, 7. Wright testified that he did not have enough labor hours that he could have spent most of his time on managerial tasks. ECF No. 159 at 214:13–16. For example, he could not delegate another associate to set up gazebos in the summer because he only had "12 hours to set it all up," and it took two people "three and a half to four hours for one." *See id.* at 219:25–220:15. Further, Wright testified that the Store Revolution neither changed the amount of manual taskwork he had to do nor made the Dock to Stock process more efficient. *See id.* at 210:14–17, 222:7–22, 223:5–6.

As discussed above, DTL Gardner testified that he "expected" Wright to spend most of his time on non-managerial work. *See* ECF No. 188 at 29:22–24. Gardner also described the Wright's store as a "rough store," where recovery, "back room," and staffing was "always an issue." *Id.* at 132:13–21. Gardner believed theses issues were "not necessarily" a reflection of Wright's management skills, but rather "the environment [Wright] was in": "[H]e was in a rough market, so his customer base was very rough with the store." *See id.* at 133:23–134:5. Gardner further testified that he believed there was insufficient payroll given to support ongoing operations, such as the changes associated with the Store

Revolution. *See id.* at 49:19–50:4. He observed "the vast majority of [Big Lots] stores struggle[ed]" with timely completely tasks. *Id.*

In 2016, Wright received a performance evaluation from Gardner that stated Wright needed to "embrace the MOD program" and make hiring "an ongoing and high priority." *See* ECF No. 121-3 at pp. 99, 134–40. But Gardner did not comment on how Wright was spending his time. Nor did Gardner direct Wright to undertake less manual taskwork. Overall, Wright received a "Meets Expectations" rating. *See id.* at p. 139.

### D.   Conclusion

As demonstrated by the evidence above, misclassification claims are "highly fact dependent." *See Wesson v. Staples the Off. Superstore, LLC*, 68 Cal. App. 5th 746, 772 (Ct. App. 2021). Defendants have not carried their burden of establishing that, viewing all evidence in the light most favorable to Plaintiffs, there is no genuine issue of material fact as to whether Plaintiffs were properly categorized as exempt. Accordingly, the Court denies Defendants' motions for summary judgment on Claims One through Three, as to all Plaintiffs.

## V.   Plaintiffs' Claims Four and Five: Good Faith Dispute

As set out in the TAC, Plaintiffs Davis, Duba, Kilgore, Mejia, Seltzer, Sharma, Smith, Walters, Wellons, Williams, and Wright are parties to both the Claims Four and Five. Plaintiffs Arredondo, Hall, Lopez, Toft, Tolliver, Viramontes, and Warner are parties only to the Claim Five. Plaintiff DeForeest is not a party to either claim.

### A.   Applicable Law

Claim Four seeks statutory penalties based on inaccurate itemized wage statements pursuant to California Labor Code section 226 and Claim Five seeks statutory waiting time penalties pursuant to California Labor Code section 203.

Under California law, "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab. Code § 201(a). Labor Code section 203(a) provides that if an employer "willfully" fails to pay wages upon discharge, the employee's wages "shall continue as a penalty" from the

discharge date for up to thirty days. However, California regulations provide that "a good faith dispute that any wages are due will preclude imposition of waiting time penalties under [§ 203]." Cal. Code Regs. tit. 8, § 13520. Those regulations explain:

> A "good faith dispute" that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a "good faith dispute."

*Id.*

Another Labor Code provision, section 226(a), requires employers to "semimonthly or at the time of each payment of wages" provide employees with "an accurate itemized statement in writing" showing certain required elements. Section 226(e) authorizes statutory penalties for "[a]n employee suffering injury as a result of a knowing and intentional failure" by an employer to comply with section 226(a).

Although district courts in California are divided on the question, the majority have held that the "knowing and intentional" requirement of section 226 is akin to the "willfulness" requirement of section 203. *See Oman v. Delta Air Lines, Inc.*, --- F. Supp. 3d ---, No. 15-CV-00131-WHO, 2022 WL 4596624, at *10 (N.D. Cal. July 8, 2022) (collecting cases). As such, courts have extended the "good faith dispute" rule used in section 203 to section 226, "even though Section 226 contains a 'knowing and intentional' standard rather than the 'willfully' standard of Section 203." *See Woods v. Vector Mktg. Corp.*, No. C-14-0264 EMC, 2015 WL 2453202, at *3 (N.D. Cal. May 22, 2015). This Court will do the same.[19]

---

[19]   Plaintiffs argue that there is no good faith defense to a claim under Section 226, citing *Furry v. East Bay Publishing, LLC*, 30 Cal. App. 5th 1072, 1085 (Ct. App. 2018) and *Kao v. Holiday*, 12 Cal. App. 5th 947, 962 (Ct. App. 2017). *See* ECF No. 225 at 8. Both cases reject the application of a good faith defense under a section 226 claim when

Defendants have raised the executive exemption defense, which fits the description of a "good faith dispute" as "a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee." *See* Cal. Code Regs. tit. 8, § 13520. The fact that Defendants did not prevail on summary judgment on this defense is "irrelevant" to the separate question presented here, "whether, based on undisputed material facts, [the employer] has raised a good-faith dispute about [the employee's] employment status." *Hill v. Walmart Inc.*, 32 F.4th 811, 817 (9th Cir. 2022). The Ninth Circuit has explained that the "operative question" in addressing a summary judgment motion raising the "good faith dispute" defense is "simply whether, based on the state of the law [at the time of employment], [the employer] has presented an objectively reasonable defense that is not marred by bad-faith conduct." *Id.* Here, the Court concludes that Defendants have met this burden.

## B. Objective Reasonableness of Executive Exemption Defense

With respect to the executive exemption defense, Plaintiffs have conceded that Defendants have established five of the six requirements for the defense. This, in itself, is some indication that such a defense is not unreasonable. Although the six requirements are distinct and each one must be satisfied for the exemption defense to apply, there is also some overlap between those requirements. The issue in this case is whether Plaintiffs were "primarily engaged in duties which meet the test of exemption" (requirement five). The fact that Plaintiffs concede that their "duties and responsibilities involve the management of the enterprise . . . or of a customarily recognized department or subdivision thereof"

---

employers argue ignorance of law. *See Furry*, 30 Cal. App. 5th at 1085 (rejecting the good faith defense to Labor Code section 226 "because it stands contrary to the often repeated legal maxim: ignorance of the law will not excuse any person, either civilly or criminally") (internal quotation marks omitted); *Kao*, 12 Cal. App. 5th at 962 (finding that "a belief [that] amounts to a mistake of law . . . is not excused under the statute mandating itemized wage statements"). Defendants are not arguing ignorance of the law, and neither case is applicable here.

(requirement one) and that they "customarily and regularly direct[] the work of two or more employees therein" (requirement two) establishes that at least *some* of their duties are exempt, even if it is a separate question whether *most* of their duties are exempt. Here, each Plaintiff was an STL, the highest-ranking supervisor and the only (purportedly) exempt position within a given store. This, too, weighs in favor of the objective reasonableness of an executive exemption defense.

Additionally, as discussed above in the denying summary judgment to Defendants on Claims One through Three, there is evidence from internal and training materials that the primary responsibility of the STL was to "lead"; that the first focus of the STL was to serve as the MOD; that the MOD role involved constantly moving through the store to remain visible, make observations, and impact customer experience and sales; and that STLs were to serve as MODs 66 percent of the time. *See* ECF No. 120-6 at 6; ECF No. 120-12 ("Week in the Life" document); ECF No. 127-3 at 9. 132. Although the Court could not conclude that the MOD role is preclusive of nonexempt tasks, the foregoing does help establish the existence of a good faith dispute.

Finally, there is individualized evidence supporting a good faith dispute on the exemption defense, in the form of Plaintiffs' deposition testimony. In denying summary judgment on the exemption defense, the Court construed Plaintiffs' deposition testimony in their favor to establish an issue of material fact for trial—even if some of that testimony was vague, lacking a thorough explanation of its basis, or internally conflicting. But in the context of determining the existence of a "good faith dispute," the analysis is different. Where Plaintiffs' contention that he or she was "primarily engaged" in nonexempt tasks is based largely on their own testimony, inconsistencies in that testimony—or even an inability to adequately explain the basis for the testimony—can help indicate Defendants' defense is not unreasonable. Here, given all the factors discussed in the preceding two paragraphs, and considering Plaintiffs' testimony as described below, Defendants have

carried their burden on summary judgment of establishing that their defense is a reasonable one.[20]

### 1. Cristal Arredondo (ECF No. 136)

In accounting for her managerial tasks on a daily and weekly basis, Arredondo provided estimates that in the aggregate support the existence of a good faith dispute. Arredondo testified that she completed the following tasks every day:

- one to two hours on "J-Walks";
- at least one hour reviewing reports or preparing her own;
- one to two hours on "shrink," which included "training, coaching, and auditing the trailers and cash"; and
- 30 minutes inspecting the store for safety issues.

ECF No. 197 at 110:18–23, 113:25–114:7, 116:15–20, 117:15–20. The above does not include the time she spent coaching and mentoring other associates—both exempt tasks—that Arredondo could not estimate. *See* ECF No. 136-1 ¶ 78. Additionally, Arredondo testified that on a weekly basis she spent time on the following managerial tasks:

- twenty-five percent of her time "fully committed" to the role of MOD;
- two to four hours preparing the store sets and end caps;[21]
- "two solid hours" making or changing the schedule for the store;
- approximately four hours for her Human Resources function;
- at least one hour on a call with the DTL; and
- approximately one hour approving payroll or editing pay records for associates.

/ / /

/ / /

---

[20]    The Court is decidedly *not* ruling that an employer is entitled to summary judgment on the existence of a good faith dispute simply because it can point to inconsistencies or inadequacies in the employee's deposition testimony.

[21]    The "end cap" is a display that faces the main walkway. ECF No. 224 ¶ 240. Arredondo testified that preparing store sets and end caps would be part of her weekly planning sessions. ECF No. 197 at 104:1–7.

*See* ECF No. 197 at 110:2–4, 111:3–11, 111:15–112:2, 112:3–14, 112:22–113:18, 114:12–14, 115:17–116:3. This testimony, in the aggregate, is in tension with her contention that she was "primarily engaged" in nonexempt duties.

### 2. Samye Davis (ECF No. 126)

Davis stated in a declaration that while serving as STL in Chula Vista (her first assignment), she spent between 50 to 60 percent of her time performing physical tasks. ECF No. 126-4 at ¶ 4. Accepting this estimate as accurate, it is sufficiently close to the "primarily engaged" requirement to create a good faith dispute. In the same declaration, she estimated that while serving as STL in National City (her second assignment), the amount of time spent on manual tasks increased to 70 to 80 percent. *Id.* During her deposition, she estimated that the time spent on physical tasks as opposed to managerial work at National City was 60 to 70 percent. ECF No. 192 at 233:6–13.[22] However, Davis was unable to provide estimates for time spent on various tasks listed in her declaration. *See id.* at 254:5–23, 259:8–24. She explained that her estimates were "approximated" and that "I did not break it down by hour." *Id.* at 276:21–277:6. This variation and lack of detail in estimates, in the context of the factors mentioned previously, support the existence of a good faith dispute.

### 3. William Duba (ECF No. 129)

Duba testified that he spent 50 percent of his time as the MOD, "supervising the entire sales floor." ECF No. 189 at 108:2–10.[23] When asked for the basis of an estimate he had given that 80 to 90 percent of his time was spent on manual labor, he answered, "I don't know, just an estimation . . . ." *Id.* at 217:10–14. When asked separately about how

---

[22] Davis also testified that she was scheduled to be the MOD for all of the hours she was scheduled to work; but that in fact, she only served in that role approximately 30 percent of the time; for the remainder of that time, "I was the manager on duty but I wasn't doing Figure 8's and wasn't stopping and coaching in the moment." ECF No. 126-3 at 53.

[23] Davis later testified that "even while being on [*sic*] a manager on duty, you're, you know, stocking and recovering and doing other things." ECF No. 129-3 at 216:141–16.

he came up with the percentage of time estimate, he answered, "[s]ounds reasonable." *Id.* at 215:19–22. Duba's estimate that he spent half his time "supervising the entire sales floor," and his inability to articulate the basis for an estimate that 80 to 90 percent of his time was spent on manual tasks, support the existence of a good faith dispute.

### 4.   Sylvia Hall (ECF No. 130)

Asked about time she spent performing managerial work rather than physical tasks, Hall testified that she spent 15 to 20 percent of her time "with hiring, training, administrative work . . . [and] [d]ealing with customer complaints, things like that." ECF No. 185 at 47:13–16. Asked, "[t]hen what percentage of your time would you say you spent serving as the primary Manager on Duty," she responded, "I'd say 50 percent of my time would be Manager on Duty." *Id.* at 47:21–25. Together, these responses support the existence of a good faith dispute.

### 5.   Garrick Kilgore (ECF No. 122)

Kilgore testified that "probably 70 percent of his day" was about "planning and leading" the freight flow process, which he described as a "broken" process. ECF No. 182 at 154:20–155:8. Although Plaintiffs may argue that some of this time also involved manual tasks, Kilgore's testimony on this point supports the existence of a good faith dispute.

### 6.   Nathaniel Lopez (ECF No. 133)

Lopez presents a closer case on the question of a good faith dispute than many of his co-Plaintiffs. Lopez testified that in an average week, he spent 75 to 80 percent of his time stocking freight. ECF No. 180 at 189:17–18, 204:2–9. This estimate did not include additional time that Lopez would spend unloading the freight to be stocked. *Id.* at 191:16–23. Lopez did not recall any company document that identified stocking as a role for an STL. *Id.* at 180:18–181:4. He did not recall receiving any company documents about the MOD program, and did not understand that serving as MOD was a primary function of the STL. *Id.* at 182:21–183:3. He was unable to estimate how much time he spent as MOD in a given week. *Id.* at 104:25–105:2. In short, during the deposition, Defendants were unable

to meaningfully undermine Lopez's estimate of the time he spent stocking freight, even though that estimate was based entirely on Lopez's memory, and Lopez was unable to provide a similar estimate of the MOD role. With Plaintiffs conceding that Defendants met all requirements of the executive exemption defense except the "primarily engaged" requirement, and in the context of the other factors mentioned previously, the Court determines that on balance there is a good faith dispute on the exemption defense.

### 7.    Saul Mejia (ECF No. 128)

Mejia testified that during the first several weeks of his employment, he spent 50 percent of his time on managerial duties. ECF No. 179 at 313:22–314:1. Thereafter, he spent between 70 to 75 percent of his time doing nonexempt, manual work. *Id.* at 303:17–304:25. However, he declined to give a quantitative breakdown of these tasks. *Id.* at 303:1–5 ("[A] lot . . . to give you a metric, it's a little impossible."); 303:12–16 ("To sit here and tell you a definitive number, I can't. But it's a lot."); 303:19–20 ("All I can tell you, I bunch all this stuff up and tell you . . . 70 percent, 75 percent is labor stuff I did."); 304:21 ("I can only group it together, sir."). Where Plaintiffs are relying on Mejia's estimate as the principal evidence that he was primarily engaged in nonexempt duties, Mejia's inability to account for the quantitative basis of his estimate supports the existence of a good faith dispute.

### 8.    Tina Seltzer (ECF No. 137)

Seltzer agreed that she spent "most of [her] time" as the MOD. ECF No. 209 at 117:25–118:3. One of MOD duties was doing a "figure 8," walking through the store. *Id.* at 98:1–23. Seltzer explained that "you are finding areas that need assistance throughout the store. And if you find something, you can bring someone in or you can fix it yourself right then." *Id.* at 100:1–10. She was doing figure 8s "all day." *Id.* at 97:13–16. She also stated that as the MOD, she was coaching and training "all day." *Id.* at 136:8–17. Seltzer's testimony, and the difficulty distinguishing the managerial work she performed as the MOD from the manual work performed in that role, support the existence of a good faith dispute.

### 9.  Satya Sharma (ECF No. 138)

Sharma testified in her deposition that she worked between 50 to 60 hours a week. ECF No. 171 at 89:4–20. When asked how she spent those hours, she responded that she spent 45 hours per week "planning, leading and directing." *Id.* at 93:3–17. Sharma also testified that she completed the following tasks per week:

- five hours utilizing company reports and tools to assess efficiency, analyzing trends, and identifying opportunities to improve store performance;
- ten hours leading all store processes according to company standards;
- five hours scheduling and processing payroll;
- three to five hours for HR related tasks;
- three to five hours approving and administering appropriate disciplinary action to associates;
- three to five hours directing the preparation of merchandising initiatives; and
- three to five hours acting as the MOD.

*Id.* at 93:18–95:6. The foregoing task estimates provided by Sharma support the existence of a "good faith" dispute.

### 10.  Jacqueline Smith (ECF No. 127)

Smith testified that she spent "up to 60 percent" of her time performing physical tasks. ECF No. 170 at 207:13–208:4. She spent the rest of her time "[w]alking the floor" as the MOD. *Id.* at 216:17–19. This estimate is sufficiently low and ambiguous that it supports the existence of a good faith dispute.

### 11.  Karen Toft (ECF No. 135)

In a declaration, Toft stated that she spent at least 60 percent of her time performing physical tasks. ECF No. 135-3 at p. 276. When asked in her deposition to provide an estimate of specific tasks, she repeatedly answered that she could not provide one because every day was different. ECF No. 167 at 228:24–229:22. She then testified that, although she could not provide such estimates, "I know I spent an average of 65 percent of my time on manual tasks." *Id.* at 229:23–230:11. When asked how she calculated that percentage,

she stated, "I estimated I spent about six-and-a-half hours on manual tasks, and about four-and-a-half fours a day on managerial tasks." *Id.* at 232:17–24. This fraction amounts to 59 percent of time spent on manual tasks. Toft's estimates, as well as the variability of those estimates and her inability to provide detail supporting her estimate, support the existence of a good faith dispute.

### 12.    Charlisa Tolliver (ECF No. 131)

Tolliver stated in a declaration that she estimated spending about 75 percent of her time doing physical tasks, both at the Rancho Cucamonga store and at the Cathedral City store. ECF No. 166 at 202:20–25. In her deposition, she was not able to explain the basis for this. When asked, "where is the 75 percent number coming from," she answered: "Well, beyond everything else. I mean, as far as I'm concerned we're always -- as I said we're always doing something. It's not always within my store. I've been pulled many, many, many times to other stores to do many things." *Id.* at 206:1–7. Asked again, she explained:

> Q. Let me just get down to it, Ms. Tolliver, you don't know where the 75 percent comes from, do you?
>
> A. That's my best recollection of the time I spent average doing tasks and recovery and all of that.
>
> Q. And how did you come up with that percentage?
>
> A. I don't remember during my declaration exactly trying to give a good estimate of doing tasking.

*Id.* at 211:1–11. Tolliver acknowledged that, at least after the Store Revolution, the focus of the STL was serving as the MOD. *Id.* at 215:1–4. But when asked twice about how much time she spent serving as the MOD, she did not remember. *Id.* at 215:10–17. Where Plaintiffs are relying on Tolliver's estimate as the principal evidence that she was primarily engaged in nonexempt duties, her inability to account for the basis of her estimate supports the existence of a good faith dispute.

/ / /

### 13.   Manuel Viramontes (ECF No. 134)

When asked how much time was spent "on a typical day walking the sales floor, observing issues within the store, directing employees to address the issues that you've identified during your walk," Viramontes answered: "That's my day, my total day. That's what I spent the day doing every day." ECF No. 165 at 127:11–19. He also testified that he worked on average 55 hours per week. *Id.* at 13:16–19. Within each week, he spent up to 28 hours on specific managerial tasks:

- two to three hours on scheduling;
- one hour interviewing;
- two hours conducting new hire orientation;
- one to two hours per week conducting meetings;
- two hours on coaching/counseling;
- four to six hours planning for upcoming deliveries;
- two hours training; and
- five to 10 hours doing cash and sales reconciliations.

*Id.* at 44:7–17, 50:7–13, 50:18–22, 53:15–21, 58:25–89:23, 72:15–18, 75:25–76:12, 106:10–108:23. The foregoing testimony and task estimates provided by Viramontes support the existence of a "good faith" dispute.

### 14.   Michael Walters (ECF No. 132)

Walters testified that he spent 75 percent of his time on nonexempt tasks, but he was unable to estimate how much time he spent performing specific exempt or nonexempt tasks. *See* ECF No. 164 at 106:9–12, 138:25–140:22, 142:21–25, 143:22–24, 168:16–171:3. Where Plaintiffs are relying on Walters's estimate as the principal evidence that he was primarily engaged in nonexempt duties, his inability to account for the basis of his estimate supports the existence of a good faith dispute.

### 15.   Laura Warner (ECF No. 125)

Warner testified that she worked 55 to 60 hours per workweek, ECF No. 163 at 176:14–15, but the amount of time that she estimated for specific manual tasks she performed far outnumbered the total amount she worked. Warner testified that, per week,

48

she spent three to seven hours unloading Distribution Center trucks; six hours unloading trucks from vendors; 25 hours stocking shelves; 25 to 30 hours on merchandising; 15 to 20 hours selling to customers; 20 hours running the cash register; two hours taking the trash; two hours cleaning; and four to five hours loading furniture into customers' vehicles, in conjunction with sales. *Id.* at 139:17–22, 171:3–5, 172:13–16, 176:7–18, 177:23–178:5, 179:25–180:8, 180:24–181:3, 181:21–182:8. At minimum, these estimates total over 100 hours per week on nonexempt tasks alone.

Further, Warner testified that the time she estimated for merchandising tasks was "separate" from unloading the trucks and stocking the shelves. *Id.* at 175:8–21. But these three tasks alone would amount to 59 to 68 hours per week, far exceeding the 75 percent of the workweek that Warner estimated she spent on manual tasks. *See id.* at 186:23–187:7. Warner's seemingly conflicting testimony regarding her time spent supports the existence of a good faith dispute.

### 16.   Sean Wellons (ECF No. 123)

In a declaration, Wellons stated that he spent 80 to 90 percent of his time on nonexempt work. ECF No. 123-3 at pp. 258–59. Wellons testified in his deposition that on a weekly basis he spent approximately 13 to 16 hours stocking shelves; 10 to 15 hours performing merchandising tasks; 12 to 15 hours assisting customers; two to five hours running the cash register; one to two hours taking out the trash and baling cardboard; and one to two hours cleaning. ECF No. 161 at 207:23–210:6. This did not include the time he spent building and loading furniture into customers' vehicles during the six-month period when the store carried "lawn and garden" items. *See id.* at 211:19–212:19.

However, Wellons indicated that he was unsure about these estimates. *See, e.g.*, *id.* at 208:1–2 (". . . I'm going to throw out a number here."), 208:14 ("Again, this is going to vary."), 208:24–25 ("That's going to be a difficult one to kind of gauge on how much time I spent on that."); 209:15–16 ("I mean, it's going to vary on that as well."), 210:5–6 ("Maybe, I don't know, an hour or two a week I suppose."). Wellons further admitted that "every number" he provided regarding the amount of time he spent on nonexempt tasks

was "a guess" or "a complete guess." *See id.* 216:4–6, 219:17–25. Where Plaintiffs are relying on Wellons's estimates as the principal evidence that he was primarily engaged in nonexempt duties, these admissions support the existence of a good faith dispute.

### 17.   David Williams (ECF No. 118)

Williams testified that he spent 30 to 40 percent of his time on managerial duties and 65 to 75 percent of his time on manual tasks. ECF No. 160 at 215:20–24, 276:2–8. But when asked about the basis of these percentages, Williams agreed that it was "impossible . . . to provide an accurate representation of the time [he] spent performing certain tasks as an STL." *Id.* at 337:15–19. Williams also agreed that the numbers were "a complete guess." *Id.* at 337:21–23. Further, Williams testified that even when he was doing manual tasks, he still acted as the MOD, answering associate questions. *Id.* at 119:16–25. Although Williams provided estimates for certain manual tasks that he performed on a weekly basis (e.g., unloading trucks, stocking freight, cleaning, etc.), the conceded guesswork in his testimony supports the existence of a good faith dispute, where Plaintiffs are relying on his estimates as the principal evidence that he was primarily engaged in nonexempt duties.

### 18.   John Wright (ECF No. 121)

Wright testified that he spent "somewhere in the neighborhood of 80 to 85 percent of physical work at the store." ECF No. 159 at 209:16–18. It is unclear, however, whether this estimate took into account the ten to 14 hours he spent working from home on exempt tasks, such as scheduling and interviewing applications. *See id.* at 206:23–25, 207:22–25. Further, when asked about his time spent on "essential duties and responsibilities," Wright could not explain how much time he spent on each managerial task in a given week. *See id.* at 185:15–19. Where Plaintiffs are relying on Wright's estimate as the principal evidence that he was primarily engaged in nonexempt duties, he ambiguity in Wright's testimony and his inability to account for the basis of his estimate support the existence of a good faith dispute.

/ / /

/ / /

## C.     Bad Faith

Plaintiffs also contend that Defendants' exemption defense was presented in bad faith because "Defendants knew that their store managers were improperly classified as exempt." *See* ECF No. 226 at 28. In support of their argument, Plaintiffs cite (1) a 2009 Declaration of Robert Crandall (the "Crandall Declaration"); (2) a 2013 Claris Project Final Report (the "Claris Report"); (3) a 2014 PowerPoint presentation written in part and presented by Defendants' Senior Vice President of Stores and Store Operations Nick Padovano (the "Padovano PowerPoint"); and (4) a 2016 Physiotherapy Associates Job Task Analyses (the "Physiotherapy Analysis"). *See* ECF 226 at 29. These documents fail, however, to establish bad faith.

### 1.     The Crandall Declaration[24]

The Crandall Declaration is an expert report that Defendants filed in 2009 in opposition to class certification in a consolidated lawsuit entitled *Big Lots Wage and Hour Cases*, Consolidated Case No. 4541, in the Superior Court of California for the County of Los Angeles. *See* ECF No. 206, Ex. A. The Crandall Declaration did not address whether store managers[25] were exempt or nonexempt employees. *See id.* Rather, the Crandall Declaration indicated that:

> manager specific factors, such as experience, supervisory ability, preferences, and management style, and store specific factors such as associate productivity, the nature of the customer base, sales volume, and the product mix drive variability in [store managers'] time allocations between managerial and non-managerial duties.

---

[24]   Plaintiffs seek judicial notice of the "existence and content" of the Crandall Declaration, among other documents. ECF No. 206 at 2. Given that the contents of the Crandall Declaration are disputed, and the Court does not rely on the Declaration to find bad faith here, Plaintiffs' request is denied as moot. *See* Fed. R. Evid. 201.

[25]   The Crandall Declaration, Claris Report, and Padovano PowerPoint predate the job title change from "Store Manager" to STL in 2015. *See* ECF No. 119 ¶ 15.

*Id.* ¶ 85. The Crandall Declaration stated that "[o]f the 40 managers observed, 37.5% were observed to spend less than half of their time on managerial duties while 62.5% were observed spending more than half of their time performing managerial duties." *Id.* ¶ 89. Although Defendants may have aware that some of their store managers in 2009 were spending less than half their time on "managerial duties," this does not establish that Defendants' exemption defense as to any of the 19 Plaintiffs here is presented in bad faith.

### 2.    The Claris Report

In 2013, Defendants retained an outside consulting firm, Claris, to perform an "operational assessment" of its stores. *See* ECF No. 225 at 11; *see also* ECF No. 205 at 119. One goal was to determine "labor standards," or the time it takes to perform a specific task, to create a mathematical formula for allocating labor hours to Defendants' stores through the Empower software. *See* ECF No. 224 ¶¶ 329–31. The study was based on visits of ten Big Lots stores, only two of which were located in California.[26] *See* ECF No. 205 at 124; ECF No. 228 at 5. The resulting Claris Report (titled "Labor Standards and Business Process Improve (BPI) for Store Operations") was completed in May 2013, whereupon Defendants utilized it to implement the Empower labor scheduling system. *See* ECF No. 225 at 12.[27] The Claris Report found that store managers' work consisted of the following categories:

- 56 percent on "Tasks";
- 2 percent on "Other Tasks Not Categorized";
- 30 percent on "Communication";
- 8 percent on "Analyzing Business"; and
- 5 percent on "People."

*See* ECF No. 205 at 144. Another part of the Claris Report states that the "[m]ajority of store manager work is task work at 89%." *See id.* 145.

---

[26]    The two California stores were located in North Hollywood and Bakersfield. ECF No. 205 at 124. No Plaintiff was assigned to either of these locations.

[27]    Save for a few pages, the majority of the Claris Report is redacted.

The author of the Claris Report, Wade Mosteller, confirmed in his deposition that the term "tasks" included both nonexempt tasks and management (i.e., exempt) tasks. *See* ECF No. 193 at 109:12–113:18. Mosteller also testified that the study was not performed to give an "accurate representation of whether store managers were performing exempt duties or nonexempt duties." *Id*. at 108:11–15.

Similarly, William Boas, Defendants' Regional Vice President for California, testified that the Claris Report was "to help the field organization understand the relative nature of customer service and customer engagement versus activities that were not customer facing." ECF No. 196 at 46:14–17. Boas explained that the Claris Report "didn't differentiate between management supervisory tasks and manual labor tasks." *Id.*; *see id.* at 47:21–48:4. This is reflected in the Claris Report itself, which states that "tasks" include exempt tasks like scheduling, "Payroll Management and Reporting," and "Research Loss Prevention Issues." *See* ECF No. 205 at 142; *see also* 29 C.F.R. § 541.102 (listing examples of managerial functions). Further, the Claris Report stated that 51 percent of store managers' work comprised "Management Tasks."[28] *See* ECF No. 205 at 145. As such, this report does not establish bad faith.

### 3. The Padovano PowerPoint

Over a three-day period from 23 to 25 September 2014, Defendants presented the Padovano PowerPoint to their executive team to introduce Empower software in connection with the Store Revolution. *See* ECF No. 224 ¶ 393; ECF No. 205 at 204 (Padovano PowerPoint). Padovano testified in his deposition that he was the primary author the Padovano PowerPoint and gave the presentation, along with others. *See* ECF No. 224 ¶¶ 384, 393; ECF No. 176 at 39:25–40:6. Mosteller described the Padovano PowerPoint as "the labor scheduling pilot" related to the Empower software for which Claris determined

---

[28]   "Under Wage Order 7-2001, the term 'primarily' means more than one-half the employee's work time." *Ortiz*, 389 F. Supp. 3d at 739 (citing Cal. Code Regs. tit. 8, § 11070(2)(K)).

the "labor standards." *See* ECF No. 193 92:21–93:8. Mosteller further explained that the PowerPoint was "used to introduce the Empower scheduling program to the pilot stores" and served as "talking points." *See id.* at 96:14–18.

Almost the entirety of the over-150-slide PowerPoint is redacted. The only substantive slide that is unredacted provides, in relevant part:

> Existing State – Roles and Responsibilities
> - Store Manager – Task Driven
>   – 64% of time spent on tasks
>     • Merchandise Flow
>     • Running registers
>   – 17% customer service
>   – 19% Managing

*See* ECF No. 205 at 211. [29] Padovano explained that he "was using this page as an illustration of . . . [his] observation of where [STLs] were spending their time versus future state of what we wanted them to be doing." *See* ECF No.176 at 74:20–24. Padovano testified that "a store team leader is to be spending 80 percent of their time on leadership activities." *id.* at 25:20–22, but he observed that STLs "were choosing to spend too much time on non-leadership activities," *id.* at 25:2–4. The Store Revolution was "specifically geared at addressing the leadership expectations of each of the roles of the management team." *Id.* at 25:14–17.

Mosteller confirmed that the "same definition of tasks [from the Claris Report] appl[ies] to this slide [from the Padovano Report]." *See* ECF 193 at 113:10–12. Thus, according to Mosteller, the term "tasks" included both management and nonexempt tasks. When Plaintiffs' counsel directly asked Mosteller if the Padovano PowerPoint meant to

---

[29]   If any explanation was included in the Padovano PowerPoint as to the method used to derive these numbers, it has been redacted. The Court can only rule based on the evidence provided, such as the deposition testimony regarding the PowerPoint. For example, Mosteller explained in his deposition that the numbers in the Claris Report and the Padovano PowerPoint differ because they are "two different cuts of that data." *See* ECF No. 193 at 97:25–98:1.

"communicate[]" to Big Lots that "store managers are spending a lot of time on stuff that's not management," Mosteller responded, "No, no." *See id*. at 98:16–21. Like Padovano, Mosteller described the purpose of the study as trying to figure out how to "reduce tasks overall in the store . . . and focus more on customer service." *See id*. at 98:24–25. Like the Claris Report, the Padovano PowerPoint does not establish bad faith as to Defendants' assertion of the executive exemption defense in this case.

### 4.     The Physiotherapy Analysis

In 2016, Defendants retained another outside consultancy firm, Physiotherapy Associates ("Physiotherapy"), to determine the physical demands of each position in a Big Lots store, including the position of STL. *See* ECF No. 224 ¶¶ 401, 415, 420; *see also* ECF No. 205 at 96, 104. The resulting Physiotherapy Analysis (ECF No. 205 at 86–83) summarized the findings based on Physiotherapy's observation of two Big Lots stores in Columbus, Ohio. ECF No. 224 ¶ 416. No Plaintiffs or any stores in California were observed in this study. *See* ECF No. 168 at 50:8–10.

Plaintiffs argue that because Physiotherapy Analysis indicated that the STL position had a "Heavy" physical demand level, Defendants were aware Plaintiffs were misclassified as exempt. *See* ECF No. 225 at 14; *see also* ECF No. 205 at 86. In response, Defendants argue that the Physiotherapy Analysis is inapplicable given that Physiotherapy observed the STL position at each of the two Ohio stores for no more than an hour and someone directed employees to perform physical tasks for the purposes of the analysis.[30] *See* ECF No. 173 at 66:1–17. Defendants further contend that the Physiotherapy Analysis was intended only for workers' compensation and disability accommodation purposes, not for wage-and-hour purposes or to examine the exempt status of STLs. *See* ECF No. 228 at 7.

---

[30]     Plaintiffs themselves rely on the wide variation in how STLs spend their time. *See* ECF No. 225 at 22. They concede that not all stores are the same due to "sales volume, mix of merchandise sold, how difficult it is to get staff, and the physical layout." *See id*.

The Court agrees with Defendants that the Ohio-based Physiotherapy Analysis does not establish bad faith in this case.

### D.   Conclusion

Accordingly, based on the existence of a good faith dispute on Defendants' executive exemption defense, the Court grants summary judgment on Claims Four and Five as to all Plaintiffs asserting those claims.

## VI.   Claim Six: Wellons's PAGA Claim

In Claim Six, Plaintiff Wellons seeks civil penalties under PAGA, Cal. Lab. Code § 2699, on behalf of himself and other aggrieved employees, defined as:

> All persons employed by Defendant, PNS Stores, Inc., at any time after 22 January 2017, within the State of California in the capacity of Store Manager (a/k/a "Store Team Leader") who have worked in excess of eight (8) hours in a workday, and/or in excess of forty (40) hours in a workweek, but who have not received overtime compensation at one-and-one-half times their regular rate of pay.

ECF No. 1-5 ¶ 47. "An employee bringing a PAGA action does so as the proxy or agent of the state's labor law enforcement agencies, who are the real parties in interest." *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 435 (9th Cir. 2015). The California Legislature passed PAGA to rectify "two perceived flaws in California's Labor Code enforcement scheme": (1) the lack of civil penalties to "redress violations of some provisions of the Labor Code," and (2) the "shortage of government resources to pursue enforcement." *Id.* at 430. PAGA enables "aggrieved employees to act as private attorneys general to collect civil penalties for violations of the Labor Code." *Id.* If a PAGA plaintiff recovers civil penalties, 75 percent is distributed to the Labor and Workforce Development Agency ("LWDA"), and 25 percent to the aggrieved employees. Cal. Lab. Code § 2699(i).

Defendants' summary judgment brief devotes a single, conclusory paragraph to Wellons' PAGA claim, arguing that because Plaintiffs' other claims fail, the PAGA claim fails as well. ECF No. 123 at 20–21. Wellons offers only a cursory response, arguing that

1    if Defendants obtain summary judgment on Wellons's overtime claims, the PAGA claim

2    should be remanded. ECF No. 209 at 19–20.

3            Because the Court has denied summary judgment to Defendants on Claims One

4    through Three, Wellons's PAGA claim survives. However, the Court agrees with

5    Defendants that Wellons's PAGA claim "fails as to anyone who is not currently identified

6    as a Plaintiff in this action." ECF No. 123 at 21. Plaintiffs cannot recover on behalf of

7    individuals whom Plaintiffs have not shown a violation of the Labor Code by Defendants.

8    *See Cardenas v. McLane FoodServices, Inc.*, 796 F. Supp. 2d 1246, 1260 (C.D. Cal. 2011)

9    ("Plaintiffs . . . must prove Labor Code violations with respect to each and every individual

10   on whose behalf Plaintiff seeks to recover civil penalties."). No such evidence is before the

11   Court. Nor is the Court under an obligation to "consider any affidavits, declarations, or

12   other documents as evidence in support of Plaintiff's opposition unless Plaintiff, in an

13   opposition brief, identifies what the documents are and where they came from, cites to the

14   particular portions of the documents that support his opposition, and sets forth arguments

15   explaining how each document and its contents support the arguments and allegations

16   made in his brief." *Murphy v. Kelso*, No. 12-CV-0309, 2016 WL 110211, at *6 (E.D. Cal.

17   Jan. 11, 2016). *See also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029

18   (9th Cir. 2001) (noting that even if a document is on file, "a district court need not consider

19   it in opposition to summary judgment unless it is brought to the district court's attention in

20   the opposition to summary judgment").

21           The Court also agrees with Defendants that Wellons's PAGA claim does not cover

22   Plaintiffs whose employment ended before January 22, 2017. PAGA has a one-year statute

23   of limitations. *Brown v. Ralphs Grocery Co.*, 28 Cal. App. 5th 824, 839 (2018) (citing Cal.

24   Code Civ. P. § 340(a)). Wellons filed his PAGA Notice with the California LWDA on

25   January 21, 2018. ECF No. 1-6 ¶ 18. Of the 19 Defendants, 11 concluded their employment

26   after January 22, 2017.

27           Accordingly, the Court denies summary judgment to Defendants on Wellons's

28   PAGA claim based on the failure to pay overtime compensation, but limits the aggrieved

employees to Plaintiffs Davis, Duba, Kilgore, Mejia, Seltzer, Sharma, Smith, Walters, Wellons, Williams, and Wright.

**VII.   Conclusion**

For the foregoing reasons, the Court:

(1)   **GRANTS** Defendants' Motion for Leave to Amend (ECF No. 273), permitting Defendants to amend their answers only to assert an executive exemption defense;

(2)   **DENIES** Defendants' Motions for Summary Judgment as to Claims One, Two, and Three for all Plaintiffs;

(3)   **GRANTS** Defendants' Motions for Summary Judgment as to Claims Four and Five for all Plaintiffs asserting such claims;

(4)   **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment as to Wellons's PAGA Claim (Claim Six), as set forth above;

(5)   **DENIES** Plaintiffs' request for judicial notice of various documents (ECF No. 206) as moot; and

(6)   **DENIES** Plaintiffs' Motion for Status and Scheduling Conference (ECF No. 290) as moot.

The Parties shall appear for a Final Pretrial Conference on Thursday, February 2, 2023 at 1:30 p.m. in Courtroom 3B, and comply with Local Rules and the Chambers Rules of the undersigned with respect to required pretrial filings.

**IT IS SO ORDERED**.

Dated:  November 10, 2022

Hon. Robert S. Huie
United States District Judge

18-CV-02913-RSH-DEB